# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Appellee,　　　　　　)
　　　　　　　　　　　　　　　　　　)　　NO. 19-1002
　　　　　　　　　　　　　　　　　　)
　　　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
DENNIS SUELLENTROP, JR,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Appellant.　　　　　　)


## APPELLANT'S ADDENDUM

　　　　　　　　　　　　　　　　 /S/  Joseph M. Hogan

　　　　　　　　　　　　　　　Joseph M. Hogan, 47008MO

　　　　　　　　　　　　　　　Attorney for Appellant

　　　　　　　　　　　　　　　7751 Carondelet, Ste. 700

　　　　　　　　　　　　　　　Clayton, Missouri 63105

　　　　　　　　　　　　　　　(314) 863-9898

# ADDENDUM

1.  Jefferson County Supplemental Report relied upon by Special Agent Burbridge

2.  Potion of Government's admitted 9A admitted at Motion hearing

3.  Memorandum, Report and Recommendations of the Magistrate

4.  Memorandum and Order adopting the Memorandum Report and Recommendations of the Magistrate

5.  Judgement and Commitment Order

# JEFFERSON COUNTY SHERIFF'S OFFICE
## INVESTIGATIVE REPORT
## 17 - 64 - SUPPLEMENT #6
### INVESTIGATIVE INFORMATION

**Supplement Information**

| | | | |
|---|---|---|---|
| Date/Time Investigation | | | |
| Supplement Purpose | | | |
| Orig. Offense | STATUTORY SODOMY 1ST/POSSESSION CHILD PORNOGRAPHY | | |
| Juris Reporting | JEFFERSON COUNTY SHERIFF | Call Received | RADIO |
| For Jurisdiction | JEFFERSON COUNTY SHERIFF | Reporting Officer | 133 - POE |
| | | Reporting Dept. | JEFFERSON COUNTY |

**CAD Details**

| | | | |
|---|---|---|---|
| Date/Time Received | 01/01/2017 13:30 SUNDAY | Nature | SEXUAL ASSAULT |
| Date/Time Dispatch | | Date/Time Arrival | |
| Unit Num. | | COGIS | E1 |
| PCT/Dist | EAST ZONE | Sector | 1 |

**Respond Location**

| | |
|---|---|
| Street Address | 2566 EAST ROCK CREEK ROAD, IMPERIAL, MISSOURI, 63052 |
| Apt/Suite/Rm # | Location Desc |

**Caller Information**

| | | | |
|---|---|---|---|
| Caller Name | | | |
| Street Address | | | |
| Apt/Suite/Rm # | | Location Desc | |
| Area Code | | Phone # | |

**Occurrence Details**

| | | | |
|---|---|---|---|
| Date/Time From | 01/01/2017 00:00 SUNDAY | Date/Time To | |
| Premise | RESIDENCE | | |
| Street Address | 2566 EAST ROCK CREEK ROAD, IMPERIAL, MISSOURI, 63052 | | |
| Apt/Suite/Rm # | | Location Desc | |

**Burglary Details**

| | | |
|---|---|---|
| Entry Point | | Exit Point |
| Entry Method | | Tools Used |
| ☐ Visible Point of Entry? | | |
| Weapon/Object Used | | |

**Other Agency**

| | |
|---|---|
| Agency/Personnel | |

**Management**

| | | | |
|---|---|---|---|
| Date/Time Entered | 04/17/2017 15:19 MONDAY | Entered By | 133 - POE |

**Approval Record(s)**

| | | | |
|---|---|---|---|
| RECORDS APPROVAL | 04/27/2017 13:29 THURSDAY | Approved By | 315 - SPRUELL |
| COMMANDER APPROVAL | 04/26/2017 11:00 WEDNESDAY | Approved By | 119 - DUNN |
| OFFICER APPROVAL | 04/17/2017 15:21 MONDAY | Approved By | 133 - POE |

Suellentrop_00047

Appellate Case: 19-1002    Page: 3    Date Filed: 04/01/2019 Entry ID: 4772749

**NARRATIVE**

Sir,
In reference to report number 2017-00064, I wish to submit the following additional information.
Evidence Item 133-1 Black LG Cellular Telephone with a Crack and Broken Screen
belonging to the suspect, was remanded secured in my custody. I subsequently transported the cellular telephone to the Narcotics office where the information was extracted from the cellular telephone with the with the assistance of the narcotics personnel and their equipment.
During the extraction, I determined I had inadvertently left the password for the cellular telephone's screen lock at my office. An extraction was completed of all information that could be extracted at the time and the disk was seized as
Evidence Item 133-8 CD Rom Containing Partial Phone Extraction Completed on 1-25-2017 While Phone Screen Locked.
Once the Narcotics office was relocated and the equipment functioning properly, I transported the cellular telephone back to the office where it was again extracted with full access. The product of this extraction was seized as;
Evidence Item 133-9 Two DVD's containing Phone Extraction Completed with Phone Unlocked
Upon reviewing one of the disc, I observed numerous thumbnail pictures of obvious children. It was determined I was unable to play the videos in the current format and determined to allow such a format it would require a significantly larger digital storage device.
I once again returned to the Narcotics office and, utilizing the assistance of narcotic personnel and their equipment the cellular telephone content was extracted to;
Evidence Item 133-10 Jump Drive Containing Complete Videos From Suspect's Phone.
Ultimately, I could view twenty-one (21) videos, of an obvious criminal nature, involving an infant child and an adult man. I have provided a synopsis of the respective content of the individual videos as follows;
Video 1, recorded 12-28-2016, began at 11:47p.m. and lasting 3 minutes and 40 seconds:
Adult male, clearly visible as the suspect, performing both analingus and cunnilingus on the rectum and vagina of a female infant. The infant can be heard making noises consistent with struggling. At one portion of the video the suspect is digitally parting the buttocks of the child.
Video 2, recorded 12-29-2016, began at 5:23a.m. and lasting 13 minutes and 46 seconds:
Adult male turns nude female infant onto her chest and can be heard saying "ready". Adult male wipes the infant's rectum and positions the baby with the buttocks elevated slightly upward. The male exposes his penis and begins rubbing the penis on the against the infant's buttocks and rectum. The baby attempts to crawl in the video but is unable to do

Appellate Case: 19-1002    Page: 4    Date Filed: 04/01/2019 Entry ID: 4772749

so. The man positions the camera several times throughout this portion of the video and the baby's face becomes clearly visible. Near the five minute mark of the video the man turns the infant on to her back exposing her vagina and the man laughs. The man appears to attempt penetration, of the vagina, with his penis. He begins rubbing the head of his penis against the baby's vagina while masturbating. The adult man places his penis against the baby's lips and partially inserts the head of the penis into the baby's mouth. At one point the infant grips the man's penis and attempts to suckle the phallus. The man returns to rubbing his penis against the vagina, while the bulk of the penis in secured between the infant's thighs. Ultimately the man ejaculates onto the stomach, chest and face of the infant. Afterward, the man cleans, redresses and begins to bottle-feed the infant.

Video 3, recorded 12-29-2016, began at 8:58a.m. and lasting 1 minutes and 40 seconds:
The video begins with a clear image of M.S. and the suspect places his tongue inside the baby's mouth numerous times.

Video 4, recorded 12-29-2016, began at 8:59a.m. and lasting 26 seconds:
The video begins with a clear image of both Sullentrop and M.S. and the suspect places his tongue inside the baby's mouth numerous times.

Video 5, recorded 12-29-2016, began at 9:04a.m. and lasting 3 minutes and 35 seconds:
The video begins with a clear image of M.S. and the suspect places his tongue inside the baby's mouth numerous times.

Video 6, recorded 08-19-2016, began at 11:54p.m. and lasting 11 minutes and 16 seconds:
*victim was approximately 55 days old at the time of this incident
The video begins with a nude female infant lying in the front passenger seat of a moving vehicle. An adult male is depicted squeezing the infant's vagina, while the baby is screaming. A male voice states, "Nobody can hear you up here." The voice than says, "We're too close to that house there." While driving, the male remarks, "I want to do bad tonight, you'll like it though." Shortly thereafter, the suspect stops the vehicle, turns the engine off and opens the door. He tells the infant, "Don't roll over that way." The infant again begins crying and the suspect says, "Give daddy a kiss", before he begins licking the baby's mouth and inserting his tongue into her mouth. The infant continues to cry as Sullentrop continues inserting his tongue into her mouth, at one point holding her head in place while doing so. As he continues in this manner the baby cries and screams. Sullentrop then turns his attention to the baby's vagina and rectum and performs both cunnilingus and analingus. Sullentrop stops to ask the 55-day old child, "Ima do it like this okay? Hold it right there." He continues to orally

Appellate Case: 19-1002    Page: 5    Date Filed: 04/01/2019 Entry ID: 4772749

abuse the baby in this manner, inserting his tongue inside of both the vagina and rectum. Sullentrop remarks, "Are you squeezing that thing tight?" As Sullentrop attempts to insert his tongue further inside the baby cries. Almost mockingly, he declares, "That's your little puss, I'm putting my tongue inside of it." As his tongue is inserted, what appears to be very deep, the baby screams. Sullentrop pauses to state, "It's ok", and inserts his tongue in the baby's mouth. Sullentrop taunts the infant, asking, "Did you taste that? Your pussy?" The victim's vagina appears reddened and Sullentrop can be heard stating, "Daddy make it feel better, okay?" He returns to cunnilingus and asks, "Does that feel better baby?" He next remarks, "Let's see if I can kiss your butt", and returns to performing analingus on the child. He states, "Alright watch it baby", and proceeds to force his tongue deeper into the infant's rectum. The video concludes.

Video 7, recorded 8-19-2016, began at 11:57p.m. and lasting 2 minutes and 37 seconds:
The video begins, still in an automobile, with an image of M.S. still nude lying on the front passenger seat. Sullentrop is performing both cunnilingus and analingus aggressively. Sullentrop can be heard struggling to force his tongue deep into the infant. The baby is squirming and crying during the event. Sullentrop says, "Little pussy. Let me just put my tongue in it okay." The suspect widely parts the labia and inserts his tongue causing M.S. to scream. Sullentrop says, "Got your little pussy hole huh?" He can next be heard stating, "Let me kiss it, let me kiss it", before licking the vaginal area once again. Sullentrop remarks, "I'm gonna put cum in your mouth." The baby begins screaming. The suspect's penis becomes visible on the recording and Sullentrop mocks the infant, stating, "Mad as fuck!" The video concludes.

Video 8, recorded 8-20-2016, began at 12:05a.m. and lasting 7 minutes and 17 seconds:
Video begins with M.S. screaming. Sullentrop is rubbing on the baby and asks, "Can I play with you?" He straddles the infant, while both are nude, and places his penis on the baby's mouth. Sullentrop says, "Let me sit down on you." The infant continues to scream and Sullentrop responds by saying, "I don't care if you're fussing." Sullentrop continues to rub his penis against the child's face while the child is crying. Sullentrop states, "You're gonna' like it." M.S. continues to scream and Sullentrop kisses the baby inappropriately. He begins to perform cunnilingus on the baby, before pausing to part the vagina wider and continue. The infant screams louder and Sullentrop states, "You gotta' be quiet there baby." He then states, "Baby, you gotta' be quiet there", and next places his penis on the infant's mouth. The child continues to scream loudly and Sullentrop says, "Was I stepping on your leg? I'm sorry baby." The baby continues to cry and Sullentrop puts his penis in the baby's mouth and Sullentrop can be heard grunting and moaning while doing so. Sullentrop

Appellate Case: 19-1002   Page: 6   Date Filed: 04/01/2019 Entry ID: 4772749

Video 12, recorded 9-08-2016, began at 10:18p.m. and lasting 3 minutes
and 36 seconds:
Begins with Sullentrop performing analingus on the child.  Sullentrop
attempts to give the baby a pacifier, which she rejects.  He provides the
baby with a bottle and begins cunnilingus.

Video 13, recorded 9-09-2016, began at 2:31p.m. and lasting 6 minutes and
30 seconds:
The suspect props the telephone up to record the event.  He removes
a nude M.S. from her basinet, holds the child in the air and performs
cunnilingus.  During that he pauses to place his tongue in the baby's
mouth.  Sullentrop picks up the telephone, continuing to record and
places the baby on the bed.  He once more props the telephone to continue
recording while he performs analingus on the infant.  Yellow fecal matter
emerges from the child's rectum, which Sullentrop wipes with his finger
and promptly returns to the act.  The child again defecates onto the
suspect's tongue.  M.S. can be heard making noise.  Sullentrop gives
the child a bottle and continues to abuse the child with his tongue.
He removes the bottle to place his tongue in the child's mouth.  Upon
returning the bottle to M.S.  he begins cunnilingus again.  Sullentrop
removes the bottle from M.S.'s mouth and inserts the nipple of the bottle
into the child's vagina and then returns to cunnilingus.

Video 14, recorded 9-09-2016, began at 3:06p.m. and lasting 6 minutes:
Video begins with M.S. nude and the suspect parting the child's vagina.
 Sullentrop performs cunnilingus on the infant.  He places the child on
her stomach and begins parting the child's rectum.  Upon doing so the
child defecates yellow fecal matter.  Sullentrop wipes the material away
with his finger and returns to analingus with the feces still on his
finger.  The child defecates again and Sullentrop wipes the child with a
dirty wet wipe.  He returns to analingus and the baby defecates again.
Sullentrop wipes the feces away with his finger and returns to the act.
In short order the child defecates again and the video stops.

Video 15, recorded 9-14-2016, began at 3:00p.m. and lasting 2 minutes and
49 seconds:
Begins with M.S. clothed and Sullentrop is placing his tongue in her
mouth.

Video 16, recorded 9-15-2016, began at 2:00a.m. and lasting 1 minute and
14 seconds:
The video features M.S. lying in her diaper and nothing sexual occurs.

Video 17, recorded 9-17-2016, began at 7:12a.m. and lasting 3 minutes and
08 seconds:
The video depicts and adult male rubbing his penis against M.S.'s feet.

Suellentrop_00052

Video 18, recorded 9-17-2016, began at 7:34a.m. and lasting 2 minutes and 28 seconds:
The entire video is Sullentrop placing his tongue in the infant's mouth.

Video 19, recorded 9-18-2016, began at 4:35a.m. and lasting 3 minutes and 40 seconds:
The entire video is M.S. laying in the basinet while Sullentrop is placing his tongue in the infant's mouth.

Video 20, recorded 9-18-2016, began at 4:36a.m. and lasting 20 seconds:
The entire video is M.S. laying in the basinet while Sullentrop is placing his tongue in the infant's mouth.

Video 21, recorded 9-18-2016, began at 4:47a.m. and lasting 1 minute and 41 seconds:
The entire video is M.S. laying in the basinet while Sullentrop is placing his tongue in the infant's mouth to the depth and point the child begins gagging and choking on the tongue.

This concludes the descriptions of the videos viewed.  Due to the disparity between Sullentrop's confession and the vast additional videos located on the cellular telephone, a follow-up interview will be conducted to clarify the location wherein the videos taken away from the home were produced.

The content of a follow-up interview will be supplemented accordingly.

I have no further information at this time.
Respectfully Submitted,

Detective Sergeant Scott M. Poe, DSN #133
Criminal Investigation Division

Suellentrop_00053

Appellate Case: 19-1002   Page: 9   Date Filed: 04/01/2019 Entry ID: 4772749

DET SCOTT POE: Dennis, my name is Scott Poe. I'm with the Sherriff's office obviously. Guess you've figured that out. My fancy car gives me away. What time you got Holly?

DEPUTY: It is 1423.

DET SCOTT POE: 1423. Ok. Well this is, ok you've been pretty honest about what's on the phone. I appreciate that. We just wanna make sure that nothing else is in that house. So we're asking for consent to search your home.

SUELLENTROP: Nnhh…

DET SCOTT POE: Ok. I'm gonna write this stuff down. What's the address here? It's 2566 right? Rock Creek. Imperial. This is considered Imperial here, right?

SUELLENTROP: Arnold.

DET SCOTT POE: Oh this is considered Arnold?

SUELLENTROP: Yea, my address is Arnold.

DET SCOTT POE: Ok. Arnold (unintelligible). What's the file on this?

DEPUTY: (unintelligible).

DET SCOTT POE: Dennis. Dennis, what's your last name?

SUELLENTROP: Suellentrop.

DET SCOTT POE: Suellentrop?

SUELLENTROP: Yea. S U E L L.

DET SCOTT POE: E N T R O P.

SUELLENTROP: Yea.

DEPUTY: 64.

DET SCOTT POE: Huh?

DEPUTY: 64.

DET SCOTT POE: Ok. Let me see what I've written here. It's me, your name, the address here. This is for a vehicle, I've written NA on that. Uh, (unintelligible) cruise on there too. Um, Deputy Lunsford. Deputy Roberts. Forrest Center here. Ok. (unintelligible). So if you willing to give us consent there, I just need to there and write your address to search your uh, your home.

SUELLENTROP: Was it, if there's anything in there? It's uh, if it's not mine, am I gonna be charged with it?

DET SCOTT POE: If it's not yours, no we'll charge whoever's with it. Whoever has it. Um…

SUELLENTROP: Even if it's in the room I was in? Sleeping in?

DET SCOTT POE: Yea, are you talking about drug related shit?

SUELLENTROP: Yea.

DET SCOTT POE: Ok. That's a bridge we'll cross when we get to it. That's, we're not gonna try to charge with anything, if you can tell us who it belongs to or you're willing to work with us, that's fine. This, this is just when I'm done if I find anything that's what that is. But if you wanna read the front, that's where it's printed in the consent, I'll show you. There it says you, Dennis Suellentrop, having authority to authorize search of the premises, and all buildings, and motor vehicles, do voluntarily consent and authorize. And see I scratched out motor vehicle cause there's no motor vehicle for me to search. I just wanna make there's no child porn shit in the house. Anything illegal like that. And that's my name and the deputies on scene. And your address. Um, so if you agree, give us consent to search the home, just sign the back there.

SUELLENTROP: Well I'd rather not have to get charged with somebody's drug shit.

DET SCOTT POE: Well I'm not looking to charge you with other, I'm here about child porn obviously. Child pornography or images and I understand why you did, that makes sense. She told me, apparently the baby mama's an asshole is what I'm gathering. Is that correct?

SUELLENTROP: Yea.

DET SCOTT POE: Ok. Um…

SUELLENTROP: But they might have drug shit and I don't wanna be charged with someone else's stuff.

DET SCOTT POE: Ok. I understand that.

SUELLENTROP: What happens if I don't sign it?

DET SCOTT POE: I, obviously I'm gonna have to apply for a search warrant to search the home then. And then it just, it just prolongs it. We'll wait a few hours, get it to a judge, and then go from there.

SUELLENTROP: So you'll get in either way?

DET SCOTT POE: Well I'm gonna try either way, yea. I'll apply for a warrant. Is that your dog?

SUELLENTROP: No. That's his dog.

DET SCOTT POE: What's his name?

SUELLENTROP: That's Paul.

DET SCOTT POE: That's your cousin, right?

SUELLENTROP: Uh-uh.

DET SCOTT POE: Oh, I thought you guys were related.

SUELLENTROP: No, I know, Paul, Jr.'s my cousin but he don't live here or come here.

Appellate Case: 19-1002    Page: 11    Date Filed: 04/01/2019 Entry ID: 4772749    Suellentrop_00340

DET SCOTT POE: Oh that's not PJ over there? (*over the radio conversation*).

SUELLENTROP: No.

DET SCOTT POE: Ok. (*over the radio conversation*) You said Paul, you threw me off. And the inventory whatever we seize or don't seize, we'll give you a copy of that (*over the radio conversation*) when we're done. Whatever was removed, if anything. (*over the radio conversation*)

SUELLENTROP: Alright, if there's drug paraphernalia in there, it's not mine. They were, they did that before...

DET SCOTT POE: Who's they?

SUELLENTROP: Like uh, I think my girlfriend and some people that came over here.

DET SCOTT POE: Ok. For New Year's?

SUELLENTROP: No. Before that.

DET SCOTT POE: Ok.

SUELLENTROP: She was gone already.

DET SCOTT POE: What an asshole. Not you, that car over there, sorry, uh, driving.

SUELLENTROP: Yea. I know that's what you meant. (*over the radio conversation*). I guess I'd rather not sign cause I don't wanna get anybody else in trouble for their drug shit. If it's in there. If anything, it'd just be drug paraphernalia. There's no...

DET SCOTT POE: No meth labs, nothing like that?

SUELLENTROP: No. (*over the radio conversation*).

DET SCOTT POE: Your choice, my friend.

SUELLENTROP: Does that mean I'm not cooperating if I don't?

DET SCOTT POE: It means you're not giving consent is what it means. That's all. Uh, hey, I'm gonna use your radio real quick.

DEPUTY: Sure.

DET SCOTT POE: I'm trying to find out who the on-call prosecutor is. (unintelligible). That's alright.

SUELLENTROP: I just don't wanna be charged with somebody else's bullshit.

DET SCOTT POE: Fair enough and it's not...

SUELLENTROP: I mean that's all it is.

Appellate Case: 19-1002     Page: 12     Date Filed: 04/01/2019     Entry ID: 4772749     Suellentrop_00341

DET SCOTT POE: It's nothing personal. Man, I'm not gonna swing. Ok. You wanna do what you wanna do, I don't blame you. Uh, that's your choice. I'm not here to uh, influence it either way, bub. Yea, 29 (unintelligible). (*over the radio conversation*). Do you have a list of the on-call prosecutors? (*over the radio conversation*). You don't happen to be the on-call prosecutor, do you sir, question mark. (*over the radio conversation*). I'm like fucking animal, I got hair all over this thing. I'm waiting to hear back from them.

SUELLENTROP: There's not any child porn or anything in my house. It just…

DET SCOTT POE: It may be not. There very well may not be and I, I don't doubt that. We just have to check, bub. We gotta understand the situation we're in, you know, we have to look… (*over the radio conversation*).

SUELLENTROP: You say you guys definitely will anyways even if I don't sign it?

DET SCOTT POE: Well if the judge grants the search warrant, yes. Uh (*over the radio conversation – 39, negative, we do not have a phone number for her*). Thank you ma'am.

SUELLENTROP: My girlfriend might have been into amphetamines so I don't want to get charged with stuff that's not mine.

DET SCOTT POE: (*over the radio conversation – 29*) 29 (unintelligible). (*I'm showing the on-duty emergency prosecutor is a Mary Pulaski. Mary Pulaski. You're ready to have your phone number?*) Clear (unintelligible) (*314-402-1794. 314-402-1794*). Clear, thank you. I have it, thank you. Ok.

MALE DEPUTY: I'm gonna question him real quick. I'll wait for him.

DET SCOTT POE: 10-4, sir.

MALE DEPUTY: Are you ok?

DET SCOTT POE: 10-4, sir. (*over the radio conversation*). Hello? (*over the radio conversation*).

DET SCOTT POE: (*on the phone*) Hey, is this Zach? Hey Zach. This Scott Poe with the Sheriff's Office. How are you? Good, sorry to make your acquaintance by calling you while you're on-call. I hadn't met, I hadn't met you. What we got here is uh, they called me out uh, gentleman staying with uh, another guy. He borrows the guy's phone. Decides to get noisy while he's doing it. Goes through, see some pictures of uh, clearly a juvenile girl uh, with a penis on the, on the lips and, and touching her vagina um, he uh, calls us. Turns the phone over, has it open, shows our deputies, they see it firsthand. Not, without provocation. They didn't ask for it. He handed it to them when they got here. Um, we have the phone. Uh, we wanna check the house to make sure there's no other child porn in there. We got the guy. He's here with us, detained. He's uh, being cooperative except for he says, he has, there might be drugs and paraphernalia in his home and he doesn't want to get charged with that. So he doesn't wanna give consent for the home. Uh, so… Ok. Not guest, they're roommate. Bona fide roommate. Yea. (*over the radio conversation*). Yes. That is right. Well yea, yea, he had permission to

Appellate Case: 19-1002    Page: 13    Date Filed: 04/01/2019 Entry ID: 4772740    Suellentrop_00342

borrow the phone. Uh, and then went through it. Yea, he said it might be, the gentleman suspect says that, yea he did that um, however uh, Dennis is saying that what it is, is the baby mama's cheating on him uh, he was, he, he said he never penetrated. He just put it like that there to get revenge. To show everybody. He never penetrated the child. How old was the child, Dennis?

SUELLENTROP: She's a baby.

DET SCOTT POE: (*on the phone*) She's a baby. Infant. Mm-hmm. That uh, he doesn't want to be charged with para- paraphernalia and drugs inside the home. It may have been left there uh, his ex-girlfriend. Mm-hmm. Mm-hmm. He said that, the ex was into methamphetamine. He doesn't want to be charged with anything she left, she has in there. How long has she been moved out, bub?

SUELLENTROP: Just a few days.

DET SCOTT POE: (*on the phone*) Just a few days. Ok. Yes.

DET SCOTT POE: (*to deputy*) You mind sit- (*over the radio conversation*) sitting with him for just a moment.

MALE DEPUTY: Ok.

DET SCOTT POE: No. I was talking to, I… (unintelligible) (*over the radio conversation*).

DEPUTY: What's your first name again?

SUELLENTROP: Dennis.

DEPUTY: Dennis. How old are you?

SUELLENTROP: 36. (*over the radio conversation*).

DET SCOTT POE: If you want back in the car you can. Yea. He… (*over the radio conversation*).

Appellate Case: 19-1002    Page: 14    Date Filed: 04/01/2019   Entry ID: 4772749    Suellentrop_00343

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 4:17 CR 435 CDP (JMB) |
| | ) |
| DENNIS M. SUELLENTROP, JR., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM, REPORT, & RECOMMENDATIONS

Currently before the Court are two suppression motions filed by Defendant Dennis M.

Suellentrop, namely a Motion to Suppress Physical Evidence (ECF No. 25),[1] and a Motion to

Suppress Statements (ECF No. 33). The government opposes both motions. The Court held an

evidentiary hearing on February 28, 2018. Thereafter, the parties submitted post-hearing

memoranda. (ECF Nos. 45, 49) Pretrial matters have been referred to the undersigned United

States Magistrate Judge, under 28 U.S.C. § 636(b). The undersigned recommends that

Suellentrop's motions be denied.

## INTRODUCTION & BACKGROUND

Suellentrop is charged in a multi-count Indictment with production of child pornography

(Counts 1-7) and possession of child pornography (Count 8). The charges resulted from

photographs and videos located on Suellentrop's cell phone. As will be discussed in greater

detail below, on January 1, 2017, an individual named Paul Donnelly provided the phone to the

---

[1] Suellentrop submitted a lengthy exhibit with his Motion to Suppress Physical Evidence.
(ECF No. 25-1) For the most part, Defendant's exhibit consists of records related to Jefferson
County Case No. 17JE-CR00001, although Suellentrop also included a copy of a federal search
warrant, issued in E.D. Mo. Case No. 4:17 MJ 1191 JMB. The undersigned has considered these
records and will refer to them, as appropriate, in addressing Suellentrop's pending motions.

Jefferson County Sheriff's Department after observing images of Suellentrop's daughter on the

phone.  Suellentrop was arrested and interviewed by the Sherriff's Department.  The case was

eventually referred for federal prosecution.

Suellentrop contends that any evidence seized from his cell phone must be suppressed.

Suellentrop argues that any warrantless search was done in violation of the Fourth Amendment.

Suellentrop also contends that a State-issued search warrant did not encompass his cell phone.

Finally, Suellentrop argues that a subsequent federal search warrant was flawed because the

affidavit submitted for that warrant intentionally or recklessly omitted material information and

included material false information.

The government argues that a warrantless search of Suellentrop's cell phone was lawful

under the private search doctrine.  The government also contends that a later examination of the

cell phone was conducted in good faith reliance on the State-issued search warrant.

Additionally, the government argues that, even if the prior State warrant did not encompass the

phone, any evidence obtained pursuant to the federal search warrant is admissible under the

independent source and inevitable discovery doctrines.

On February 28, 2018, the undersigned held an evidentiary hearing.  Shortly before the

hearing, Suellentrop filed a broad motion to suppress statements.  The Court directed Suellentrop

to narrow his motion in his post-hearing memorandum, and directed the government to respond

in its post-hearing memorandum.

At the evidentiary hearing, Suellentrop was present and represented by Joseph Hogan.

The government was represented by Assistant United States Attorney Robert Livergood.  The

government presented the testimony of Paul Donnelly, Jefferson County Sheriff's Deputies

Dennis Roberts and Hollie Lunsford, Detective Scott Poe of the Jefferson County Sheriff's

2

Department, and FBI Special Agent John Mark Burbridge. Defense counsel extensively cross-examined each witness. Suellentrop testified briefly on his own behalf.

At the hearing, the government admitted several exhibits which are summarized in the following table:

| TABLE | |
|---|---|
| **Exhibit No.** | **Description** |
| 1 | LG Cell Phone (Suellentrop's Cell Phone) |
| 2 | Picture – Home Screen on Cell Phone |
| 3 | Picture – Cell Phone Application Screen |
| 4 | Video – Demonstrating Access of Cell Phone Images |
| 5 | Alleged Child Pornography Image of Victim |
| 6 | Alleged Child Pornography Video of Victim |
| 7 | Voluntary Statement – Paul Donnelly, 1/1/2017 |
| 8 | Advice of Rights Form – Suellentrop, 1/1/2017 |
| 9 | Audio Recording – Suellentrop Interview in Deputy's Vehicle, 1/1/2017 |
| 9A | Transcript of Suellentrop Interview, 1/1/2017 |
| 10 | Permission to Search Form, Unexecuted, 1/1/2017 |
| 11 | State Search Warrant, Application, & Affidavit, 1/1/2017 |
| 12 | Return of State Search Warrant |
| 13 | Audio & Video Recording – Suellentrop Interview, 1/3/2017 |
| 13A | Transcript of Suellentrop Interview, 1/3/2017 |
| 14 | Federal Search Warrant, Application, & Affidavit, 4:17 MJ 1191 JMB, 6/20/2017 |
| 15 | Return of Federal Search Warrant |

Based on the testimony and evidence adduced at the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses, and having fully considered the parties' arguments and written submissions, the undersigned makes the

3

following findings of fact, conclusions of law, and recommendations.

## FINDINGS OF FACT

At all times relevant, Suellentrop lived at 2566 East Rock Creek Rd., Jefferson County, Missouri. The property was owned by Suellentrop's family. Suellentrop had an infant child with a girlfriend named Sarah Marcher. At the hearing, the child was sometimes referred to by name but is referred to herein as Baby M. The record indicates that Baby M. and Ms. Marcher sometimes stayed at the 2566 East Rock Creek property, but Baby M. and Ms. Marcher did not stay there the night of December 31, 2016, into the morning of January 1, 2017.

Beginning sometime before December 2016 and continuing until at least January 1, 2017, Paul Donnelly lived on the property at 2566 East Rock Creek Rd. Donnelly was a drug user[2] and acquainted with Suellentrop, Marcher, and the infant. Donnelly testified that he had known Suellentrop for about one year as of January 1, 2017. Donnelly kept a camper in the driveway, about thirty feet in front of the residence at 2566 East Rock Creek Rd. Donnelly testified that he cleaned and worked around the house and that a drug dealer named Matt also stayed there.

There was conflicting testimony regarding the extent of Donnelly's permission to reside on the property, enter the residence at the property, stay inside the residence, and use Suellentrop's cell phone. Donnelly testified that he kept his camper in the driveway and lived in the camper, but he had permission to stay inside the residence due to the cold weather. Donnelly testified that he kept clothes inside the residence and in the camper. Donnelly testified that he was permitted to stay inside during the time frame spanning New Year's Eve and Day 2016-

---

[2] Donnelly testified that, at the time of the evidentiary hearing, he was charged in state court with possession of methamphetamine. Donnelly also testified that he had a prior felony marijuana conviction for which he received a suspended imposition of sentence that has since been expunged from his record. Donnelly represented that he received no consideration in return for his testimony in this matter.

2017.  Donnelly further testified that Suellentrop gave him permission to use Suellentrop's cell phone to make calls and access Facebook after Donnelly gave his cell phone to a former girlfriend.  Donnelly testified that Suellentrop's cell phone was passcode protected and that Suellentrop had given him the code.  Donnelly also testified that, most of the time, Suellentrop was present when Donnelly used his cell phone.

In contrast, Suellentrop testified that, in November 2016, he directed that Donnelly was no longer welcome on the property and was not given permission to be in his residence or to use his cell phone.  Suellentrop testified that Donnelly must have learned his passcode by watching him enter it into the cell phone.

The undersigned credits the testimony of Donnelly to the extent it conflicts with Suellentrop's testimony.  Donnelly was candid, admitting his past criminal conduct and drug use.  Donnelly's testimony was consistent with the testimony of police who testified to events on January 1, 2017.  In contrast, Suellentrop testified that Donnelly was no longer welcome on his property as of November 2016, yet he never took steps to remove Donnelly, never called the police, and never required Donnelly to remove his camper.  Accordingly, the undersigned finds that, on January 1, 2017, Donnelly had permission to enter and stay inside the residence at 2566 East Rock Creek Rd., and permission to use Suellentrop's cell phone to make calls and check his Facebook account.

On New Year's Eve 2016, Donnelly, Marcher, and others were "partying" at a local casino.  Donnelly was using drugs that evening.  Suellentrop was not with Donnelly and Marcher.  Donnelly returned to the East Rock Creek residence around 7 a.m. or 8 a.m. on January 1, 2017.  Marcher and Baby M. did not stay at the residence on January 1, 2017.

After returning to the East Rock Creek residence during the morning of January 1, 2017,

5

Donnelly knocked on Suellentrop's bedroom door, entered the bedroom, and retrieved

Suellentrop's cell phone from the charger.  Donnelly observed Suellentrop "passed out" in the

bedroom.  Donnelly unlocked the phone and used it to make a call and check his Facebook

account.  According to Donnelly, he was being "nosey" and decided to look at Suellentrop's

photographs on the cell phone.  Donnelly accessed the photo application screen and observed a

series of thumbnail images.[3]  Donnelly did not scroll through all of the thumbnails but he

testified that he could see "pictures of girls and other things, but the main images were kind of

blurry at that size until [he] zoomed in on them."  (Tr. at 17)[4]

      Donnelly zoomed in on one image and realized it was a pornographic image of

Suellentrop's infant daughter, Baby M.  Donnelly was shown Government's Exhibit 5, which

depicted an image of an infant with a penis and what appeared to be ejaculate on the infant's

face.  Donnelly testified that Exhibit 5 was one of the images he viewed on Suellentrop's cell

phone and that the infant in the image was Baby M., who was then about six months old.

      Donnelly testified that he saw other images and a video on the cell phone.  Donnelly was

shown a portion of Government's Exhibit 6—a video showing an infant's buttocks area and an

adult's hands on and around the buttocks area.  Donnelley testified that he had also viewed the

video on Suellentrop's cell phone on January 1, 2017, and that Suellentrop could be seen at a

later point in the video.

      Donnelly testified that, while looking through the pictures on Suellentrop's cell phone, he

also saw images that did not include Baby M. but included "penises in their mouth, and …

---

[3] At the evidentiary hearing, the Court received Government's Exhibit 4, which was a
video recreating the steps Donnelly used to access the photos on Suellentrop's cell phone,
including the thumbnail images and scrolling through the thumbnails.

[4] "Tr." refers to the transcript of the evidentiary hearing held on February 28, 2018.
(ECF No. 38)

Appellate Case: 19-1002   Page: 20   Date Filed: 04/01/2019 Entry ID: 4772749

penises on the picture all around" that "seemed to be photoshopped." (Tr. at 18)

After seeing the images and video of child pornography on Suellentrop's cell phone,
Donnelly did not call the police. Rather, he called the house where he believed Sarah Marcher
was staying, which was in Imperial, Missouri. Donnelly spoke with Matt and told him what he
found on Suellentrop's phone. According to Donnelly, he intended to take care of matters "in
house." Nonetheless, the police were notified and there is no indication that Donnelly or anyone
else harmed Suellentrop.[5]

Jefferson County Sheriff's Deputy Dennis Roberts was first to arrive at the East Rock
Creek Road residence. As of the date of the evidentiary hearing, Dep. Roberts had been a deputy
for about nine years. At about 1:30 p.m., on January 1, 2017, Dep. Roberts was dispatched to
Suellentrop's residence for a child well-being check. He arrived shortly thereafter. Dep. Roberts
was met by Donnelly who was walking toward the patrol car. Donnelly told Dep. Roberts that
he borrowed Suellentrop's cell phone and that he viewed inappropriate images on that phone.
Donnelly showed Dep. Roberts one photo—the same photo that was depicted in Gov't Exh. 5.
Dep. Roberts took possession of the cell phone, turned it off, and placed it in his pocket. Dep.
Roberts did not look at contents of the cell phone any further.

Donnelly told Dep. Roberts about seeing a picture of Baby M. with a penis in her mouth,
as well as a video depicting Suellentrop "playing with the butt and the vagina area and French
kissing [Baby M.] with his tongue." (Tr. 55-56)

After Dep. Roberts began speaking with Donnelly, Jefferson County Sheriff's Deputies

---

[5] The record regarding how the police were ultimately informed is not entirely clear. But
overall, the record indicates Donnelly spoke with Matt, who was with Sarah Marcher (Baby M.'s
mother), and thereafter the police were notified and dispatched to Suellentrop's home. Matt
arrived at Suellentrop's home before law enforcement arrived, but Suellentrop remained in bed.
Donnelly testified that Matt told Sarah Marcher about the images on the cell phone.

7

Hollie Lunsford and Loness arrived at the scene.[6]  Dep. Roberts discussed what he had learned

from Donnelly with the other deputies and they decided to arrest Suellentrop.[7]  Donnelly

voluntarily opened the door and let the deputies inside the residence so they could arrest

Suellentrop.  Dep. Roberts testified that he believed Donnelly had authority to let the deputies

into the house.  The deputies were in uniform and armed, but all weapons remained holstered.

After a brief security sweep of the residence, the Deputies went into Suellentrop's bedroom and

found him sleeping.  Suellentrop did not respond to a verbal command to wake up, so Dep.

Roberts nudged him and he woke up.  Dep. Roberts directed Suellentrop to stand up and place

his hands behind his back.  Suellentrop was allowed to dress and was compliant.  Suellentrop

was handcuffed, subjected to a pat-down search, and placed in Dep. Lunsford's patrol car.

After arresting Suellentrop, Dep. Roberts provided Donnelly with a witness statement

form, a copy of which was received into evidence as Government's Exhibit No. 7.  Donnelly's

witness statement, as reflected in Gov't Exh. 7, is generally consistent with his testimony at the

evidentiary hearing, although some details differed.[8]  Dep. Roberts also contacted Jefferson

County Sheriff's Detective Scott Poe.

Dep. Lunsford testified that, when she arrived, she observed Dep. Roberts speaking with

Donnelly.  Dep. Lunsford explained that Donnelly gave her and Deputies Roberts and Loness

---

[6] Deputy Lunsford testified at the evidentiary hearing, but Dep. Loness did not.  At the
time of the hearing, Dep. Lunsford was a Detective and had been with the Sheriff's Office for
about eight years.

[7] Dep. Roberts testified that the information provided to him from Donnelly described a
crime.  (Tr. 64)

[8] For example, Donnelly testified that he arrived home around 7 a.m., but Gov't Exh. 7
indicates that Donnelly arrived home around 8 a.m.  Also, Donnelly's statement indicates that he
contacted Baby M's mother, but his testimony was that he called another person.  The
differences are not significant in the context of the issues before the Court.

permission to go into the residence to locate and arrest Suellentrop. As noted above, after

arresting Suellentrop, the officers placed him in the front passenger seat of Dep. Lunsford's car.

Dep. Lunsford entered the vehicle and presented Suellentrop with a two-page, detailed <u>Miranda</u>

warnings form. That form was admitted into evidence as Government's Exhibit 8. Using the

form, Dep. Lunsford advised Suellentrop of his rights. Dep. Lunsford completed the pedigree

information on the form based on information from Suellentrop. Suellentrop signed the form

indicating that he understood his rights, was willing to make a statement, did not want a lawyer

at that time, understood what he was doing, and that no promises, threats, or pressure/coercion

had been used against him. The form is dated January 1, 2017, with a time of 1:59 pm (1359

military time) at the top and 2:07 p.m. next to Suellentrop's signature. Page two of the form

includes a written statement from Suellentrop which reads:

> I made explicit photos in retaliation for my girlfriend cheating on me and turning
> against me. There were suggestive photos but no penetration or forced action
> with our daughter.

(Gov't Exh. 8 at p. 2) Both Suellentrop and Dep. Lunsford signed at the bottom of page two,

below the written statement.

Dep. Lunsford testified that Suellentrop was not threatened, abused, coerced, or promised

anything to induce him to talk. Dep. Lunsford advised Suellentrop that he could stop talking if

he so desired. Dep. Lunsford testified that Suellentrop appeared to understand her questions and

did not appear to be under the influence of drugs or alcohol. At no time did Suellentrop ask for

an attorney or indicate a desire to remain silent. Dep. Lunsford further testified that officers

asked Suellentrop for consent to search his home and phone and that Suellentrop declined to give

consent.

The interaction between Suellentrop and Dep. Lunsford was recorded. A copy of the

9

recorded interview and a transcript of the recording were admitted into evidence as

Government's Exhibits 9 and 9A, respectively. The recording is substantially consistent with

Dep. Lunsford's testimony.

As noted above, Dep. Roberts contacted Detective Scott Poe. When Det. Poe arrived,

Suellentrop was already in Dep. Lunsford's vehicle. Det. Poe was aware that Dep. Roberts had

received Suellentrop's cell phone from Donnelly. Det. Poe eventually took possession of the cell

phone. Det. Poe testified that he secured the phone and did not examine it. Det. Poe also

interviewed Suellentrop in Dep. Lunsford's vehicle. That interaction was also recorded. (Gov't

Exh. 9) At no time did Det. Poe threaten or coerce Suellentrop, and Suellentrop never requested

a lawyer or invoked his right to remain silent.

Det. Poe also testified that he prepared a consent-to-search form, but Suellentrop declined

to sign the form. Although Suellentrop stated that he feared that his refusal to consent would be

held against him, Det. Poe told him that it would not.

Lacking consent from Suellentrop, Det. Poe contacted an on-call prosecutor to request a

search warrant.[9] Det. Poe met with a prosecuting attorney at the Sheriff's Office and completed

an affidavit of probable cause. Thereafter, an application for a search warrant was presented to

Judge Miller. The warrant presentation process was conducted electronically.[10] At the

evidentiary hearing, Det. Poe testified that he advised the prosecuting attorney that Suellentrop's

cell phone had already been seized. Det. Poe further explained that it was his intention to obtain

a search warrant that would permit law enforcement to search both the cell phone and

---

[9] A portion of Det. Poe's conversation with the on-call prosecutor was also recorded. (Gov't Exh. 9)

[10] A copy of the warrant, application, and affidavit were received into evidence as Government's Exhibit 11, and the return was submitted as Government's Exhibit 12.

Suellentrop's residence. Based on his conversation with the prosecuting attorney, Det. Poe believed that the warrant authorized a search of Suellentrop's cell phone.

A significant issue is whether the warrant Det. Poe obtained on January 1, 2017, authorized law enforcement to search Suellentrop's cell phone. At the time the warrant was issued, the police had already seized the cell phone. Although the warrant does not specifically mention searching Suellentrop's cell phone, Det. Poe testified that he believed the warrant authorized an examination of that device. It is not disputed that the Jefferson County Sheriff's Department arranged for more than one forensic examination of Suellentrop's cell phone and that the Sheriff's Department did not obtain a separate warrant for that device. It is also not disputed that Suellentrop never consented to a search of his cell phone.

The affidavit Det. Poe submitted to Judge Miller on January 1, 2017, provided a detailed account of the investigation up to that point, including a detailed summary of how Donnelly showed images from Suellentrop's cell phone to Dep. Roberts and the nature of those images. The affidavit stated that Dep. Roberts took custody of the phone and that "no additional examination was done." (See Gov't Exh. 11) The affidavit also explained how Donnelly came into possession of Suellentrop's cell phone. The affidavit summarized Suellentrop's statements to Dep. Lunsford and Det. Poe, and that Det. Poe requested consent to search the residence "for any other electronic devices or evidence related to the crime," and that Suellentrop declined to give consent due to the possibility that drug-related materials belonging to other persons might be found in the residence. (Id.) Det. Poe represented that he believed there was probable cause to search the premises for evidence including, "DVDs, CDs, video cassettes, mass storage devices (i.e., hard drives, computers, jump drives, etc.) and photographs of victims." (Id.)

The warrant expressly authorized law enforcement to search the premises at 2566 East

11

Rock Creek Road, Arnold, MO (Suellentrop's residence) and, among other things, commanded law enforcement personnel "to search the computers, cameras, storage devices, and electronic devices seized by you, including any files that are password protected or encrypted, for … files and graphic images and/or videos depicting child pornography …." (Id.)

The affidavit and warrant were both signed and dated on January 1, 2017, at 7:19 p.m. Detective Poe prepared a warrant return and inventory (hereinafter "return"). See Gov't Exh. 12. According to the return, the warrant was executed on January 1, 2017. The return includes an inventory of items seized which appears to be separated into two categories:  drug paraphernalia and Suellentrop's cell phone, which is listed as "One LG Brand Phone provided by Reporting Party upon initial arrival." (Gov't Exh. 12)

After his arrest on Sunday, January 1, 2017, Suellentrop was held at the Jefferson County Jail. Monday, January 2, 2017, was an official holiday. On January 3, 2017, Det. Poe interviewed Suellentrop again. Prior to the interview, Det. Poe transported Suellentrop from the jail to the Jefferson County Sheriff's Office. The interview was recorded with both audio and video.[11] Det. Poe did not re-advise Suellentrop of his Miranda rights, but stated that he had Suellentrop's statement and prior advice of rights form and displayed that form to Suellentrop. At the outset of the interview, Suellentrop asked for assurances that Det. Poe would not beat him, and Det. Poe assured him that he would not. Det. Poe provided Suellentrop with a cup of coffee. From the video recording of the interview, it appears that Suellentrop understood his circumstances and was not confused or intoxicated. Det. Poe removed the handcuffs and it appears that Suellentrop was reasonably comfortable. Suellentrop was not tricked, threatened, harmed, or in any way abused or mistreated. Suellentrop did not ask for an attorney, express any

---

[11] A copy of the recording of interview was submitted as Government's Exhibit 13, and a transcript of the interview as submitted as Government's Exhibit 13A.

desire to exercise his right to remain silent, or express any complaints regarding his treatment or the interview process.

At the evidentiary hearing, Det. Poe testified that, after he received a report from the cell phone forensic examination, he prepared a supplemental report which resulted in additional charges against Suellentrop. Det. Poe explained that, at some point after he prepared his supplemental report, he spoke with FBI Special Agent Mark Burbridge about the child pornography found on Suellentrop's cell phone.

S/A Burbridge also testified at the evidentiary hearing. At the time of the hearing, S/A Burbridge had been a Special Agent for more than 30 years. S/A Burbridge was first notified of the Suellentrop matter in March 2017, and received the police reports in April 2017. After reviewing the reports and the State search warrant, S/A Burbridge determined to seek a federal search warrant. S/A Burbridge testified that he wanted to make sure he had all of the evidence that was on the phone. He also testified that he had some concern about whether the cell phone was within the scope of the State-issued search warrant. On June 20, 2017, S/A Burbridge presented an application and affidavit to the undersigned for a warrant authorizing an examination of Suellentrop's cell phone. (See E.D. Mo. Case No. 4:17 MJ 1191 JMB)[12]

In general, S/A Burbridge's affidavit summarizes the events of January 1, 2017, as recounted above. The affidavit omits any direct reference to the fact that Suellentrop's cell phone was examined on behalf of the Jefferson County Sheriff's Department after it was seized on January 1, 2017. Paragraph 24 of the affidavit states that "Deputy Roberts seized the cellular telephone and no additional examination of was done." Paragraphs 27 and 28 of the affidavit

---

[12] A copy of the application, affidavit, and warrant was submitted at the evidentiary hearing as Government's Exhibit 14. A copy of the search warrant return was submitted as Government's Exhibit 15.

13

reference the State search warrant, and paragraph 29 indicates that "[t]he search did not yield any additional items of evidentiary value relating to sodomy or child pornography." (Gov't Exh. 14) S/A Burbridge's affidavit and the associated warrant will be discussed in greater detail below.

Suellentrop also testified at the evidentiary hearing. Suellentrop testified that his parents owned the house at 2566 East Rock Creek Road and that Donnelly did not pay rent to stay there. Suellentrop testified that Donnelly lived in a camper in the driveway and that he did not give Donnelly permission to stay in the house. Suellentrop testified that Donnelly did not have his permission to use his cell phone. Rather, he represented that he told Donnelly that Donnelly was not allowed to use his cell phone. Suellentrop testified that, around Thanksgiving of 2016, he and his parents directed that Donnelly and others were to leave the property. Suellentrop further testified that Donnelly was not supposed to have his camper on the property, but he acknowledged that he never called the police to have Donnelly or his camper removed.

As explained above, to the extent Suellentrop's testimony conflicted in material respects with Donnelly's testimony, the undersigned credits Donnelly.

Additional findings of fact are included in the discussion below.

## DISCUSSION, CONCLUSIONS OF LAW, & RECOMMENDATIONS

**I.      Motion to Suppress Evidence from Suellentrop's Cell Phone**

Suellentrop seeks suppression of all evidence seized from his cell phone. First, he contends that any warrantless search of his phone violates the Fourth Amendment per Riley v. California, 134 S. Ct. 2473 (2014). Second, Suellentrop contends that a State-issued search warrant did not actually authorize any search of his cell phone. Therefore, any examination of his phone by the Sheriff's Department was warrantless and in violation of the Fourth Amendment. Third, Suellentrop argues that the subsequent federal search warrant obtained by

14

the FBI was flawed because the affidavit intentionally or recklessly omitted material information and included material false information. Thus, Suellentrop argues that he is entitled to a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), and any search conducted by the FBI was also in violation of the Fourth Amendment.

The government offers several reasons why the cell phone evidence is not subject to suppression. First, the government contends that Paul Donnelly (a private citizen) extinguished Suellentrop's expectation of privacy when Donnelly reviewed some of the photos and a video on the cell phone. According to the government, law enforcement could review the photos and videos on the phone without a warrant under the private search doctrine. Second, Detective Poe obtained a State search warrant and any examination of the cell phone should be upheld based on his good faith reliance on that warrant. Finally, even if the State warrant did not cover the cell phone, any evidence on the cell phone is admissible under the independent source and inevitable discovery doctrines because the FBI obtained a federal search warrant.

### A.    Private Search by Donnelly and Subsequent Law Enforcement Action

Suellentrop argues that the evidence should be suppressed pursuant to <u>Riley v. California</u>, 134 S. Ct. 2473 (2014), which eliminated the routine practice of searching an arrestee's cell phone incident to arrest. Suellentrop argues that Donnelly lacked permission to be in his residence and to use his cell phone. Accordingly, the police should not be permitted to make use of the evidence resulting from Donnelly's actions relative to the phone.

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" <u>United States v. Houck</u>, 888 F.3d 957, 959 (8th Cir. 2018) (citing U.S. Const. amend. IV). A person's private cell phone qualifies as an "effect" for Fourth Amendment purposes. <u>See</u>, <u>e.g.</u>, <u>Riley</u>, 134 S. Ct.

at 2485. Suellentrop is correct that, after <u>Riley</u>, the police cannot normally search a cell phone incident to arrest and must normally obtain a warrant. But the search incident to arrest exception is not at issue in this case—the government does not attempt to justify any warrantless search of Suellentrop's cell phone pursuant to that exception. Rather, the government contends that the Jefferson County Sheriff's Department was justified in searching Suellentrop's cell phone under the private search doctrine.

While <u>Riley</u> might reasonably influence how the private search doctrine is applied to cell phone evidence, <u>see</u> <u>United States v. Sparks</u>, 806 F.3d 1323 (11th Cir. 2015), <u>Riley</u> did not eliminate the private search exception for cell phones. The Eighth Circuit has continued to apply the private search exception to cell phone evidence after <u>Riley</u>. <u>See, e.g.</u>, <u>United States v. Highbull</u>, -- F.3d --, 2018 WL 3322261 (8th Cir. July 6, 2018) (applying private search exception to cell phone suspected of containing images of child exploitation).

Under the private search exception, "[t]he Fourth Amendment ... does not extend to private searches that are neither instigated by nor performed on behalf of a governmental entity.... [Rather, the] legality of later government intrusions must be tested by the degree to which they exceeded the scope of the private search." <u>United States v. Starr</u>, 533 F.3d 985, 994 (8th Cir. 2008) (citing <u>United States v. Miller</u>, 152 F.3d 813, 815 (8th Cir. 1998) (internal quotations omitted)); <u>see also</u> <u>United States v. Jacobson</u>, 466 U.S. 109, 115 (1984); <u>United States v. Goodale</u>, 738 F.3d 917, 921 (8th Cir. 2013), <u>cert. denied</u>, 134 S. Ct. 2856 (2014). "When the government re-examines materials following a private search, the government may intrude upon an individual's privacy expectations without violating the Fourth Amendment, provided the government intrusion goes no further than the private search." <u>Starr</u>, 533 F.3d at 995 (citation omitted). "The private search exception applies 'to a search or seizure, <u>even an unreasonable</u>

one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" Goodale, 738 F.3d at 921 (quoting Jacobson, 466 U.S. at 113) (emphasis in Goodale).

Our Court must consider two issues to determine whether the private search exception applies. The Court must first decide whether Donnelly was acting as a private citizen or an agent of the government. If Donnelly was acting as a private citizen, the Court must next decide the extent to which the private search exception applies, that is, what evidence is covered by the exception. The first issue is easily decided on the facts before the Court. The second issue is more nuanced.

In determining whether the private search exception applies, the Eighth Circuit recently identified the following three factors for determining when a citizen acts as a government agent in conducting a search:

> [1] whether the government had knowledge of and acquiesced in the intrusive conduct; [2] whether the citizen intended to assist law enforcement or instead acted to further his own purposes; and [3] whether the citizen acted at the government's request.... A defendant bears the burden of proving by a preponderance of the evidence that a private party acted as a government agent.

Highbull, 2018 WL 3322261 at *2 (internal quotations and citations omitted). Applying the facts developed at the evidentiary hearing to these factors squarely establishes that Donnelly acted entirely on his own when he searched Suellentrop's cell phone the morning of January 1, 2017. There is no reason to attribute Donnelly's actions to any government actor. It does not matter whether Donnelly lacked permission to use or unlock the phone. But even if permission were a factor, the undersigned finds that Suellentrop gave Donnelly permission to use the cell phone. Therefore, the private search doctrine applies to Donnelly's search of Suellentrop's cell phone.

17

This conclusion, however, does not end the inquiry. The Court must assess the extent or scope of Donnelly's search because the private search doctrine permits the government to review what Donnelly reviewed, but no more. Starr, 533 F.3d at 995. There were numerous images and videos on Suellentrop's cell phone, and Donnelly testified that he did not look at all of the images and videos. In fact, Donnelly testified that he did not even scroll through all of the thumbnail images. (Tr. at 17) Donnelly also testified that he could not clearly make out exactly what the thumbnail images depicted until he clicked on an image and blew it up. At the evidentiary hearing, the government played a demonstration to depict how Donnelly scrolled through the thumbnail images. (Gov't Exh. 4) In addition to scrolling through some of the images, the evidence and testimony from the evidentiary hearing established that Donnelly selected and expanded several images and one video. In particular, the evidence demonstrated that Donnelly viewed the image and video depicted in Gov't Exhs. 5 and 6.

The government's arguments suggest that Donnelly's private review of some images extinguished Suellentrop's expectation of privacy in all images, thereby permitting law enforcement to review all of the images and videos on Suellentrop's cell phone. As will be explained below, the undersigned disagrees and finds that the private search in this case extends only to those images that the government proved Donnelly actually could see, which were the images he expanded from thumbnail size and the video he opened and watched. Stated differently, it is beyond reasonable dispute that Donnelly's actions frustrated any expectation of privacy Suellentrop had in the images and the video that he actually viewed, and law enforcement could look at those images and that video without a warrant. See Jacobson, 466 U.S. at 109.

Therefore, the issue this Court must resolve, which no party squarely briefed, requires a

consideration of the proper "unit of measurement" for digital evidence in the private search

context.[13]  With images on a cell phone, the unit of measurement could be as narrow as the

specific images and videos enlarged and viewed by the private citizen, or as broad as the entire

cell phone, or somewhere in the middle, such as a photo folder/directory or all thumbnail images

scrolled through.  The government's arguments suggest that, because Donnelly scrolled through

some thumbnail images and specifically viewed several images and one video of suspected child

pornography/abuse, Suellentrop's expectation of privacy in all images was frustrated.  See Gov't

Post-Hearing Brief at 11-22.  Implicit in the government's argument is that the unit of

measurement is at least the entire photograph folder on Suellentrop's cell phone.  The

government's arguments rely heavily on an unreported case from the Eleventh Circuit.  See

United States v. Harling, 705 Fed.Appx. 911 (11th Cir. 2017).   An earlier reported case from the

Eleventh Circuit, however, is more apt and not as favorable to the government's position.

In United States v. Sparks, 806 F.3d 1323 (11th Cir. 2015), cert. denied, 136 S. Ct. 2009,

137 S. Ct. 34 (2016), the two defendants left a cell phone at a Walmart store.  A Walmart

employee found the phone and made arrangements to return it.  The employee also looked at the

contents of the phone (which was not password protected) and discovered images of child

pornography and contacted law enforcement.  The first Walmart employee showed the images to

another employee by displaying all of the thumbnail images in the album and some full-sized

images.  The images depicted child pornography.  The second employee took the cell phone to

the police.  Sparks, 806 F.3d at 1329-31.  At the police station, the second employee "scrolled

---

[13] See Orin Kerr, Searches and Seizures in a Digital World, 119 Harv. L. Rev. 531, 554
(2005); Orin Kerr, 11th Cir. deepens the circuit split on applying the private search doctrine to
computers, The Volokh Conspiracy Blog (Dec. 2, 2015), available at
http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/12/02/11th-circuit-deepens-
the-circuit-split-on-applying-the-private-search-doctrine-to-
computers/?noredirect=on&utm_term=.8f70dd97c150 (last visited June 30, 2018).

Appellate Case: 19-1002   Page: 33   Date Filed: 04/01/2019 Entry ID: 4772749

through the entirety of the album in thumbnail form, pausing several times to show [officers] full-size images." Id. at 1131. The officers then gave the cell phone to a detective and showed him some of the images. The detective then looked at two videos also stored in the same photo album on the phone. The Walmart employees, however, had only viewed one of the two videos. Id. at 1132.

The district court in Sparks found that the private search conducted by the Walmart employees encompassed the entire digital photo album. The district court's conclusion rested largely on the fact that the Walmart employees had scrolled through all of the thumbnail images in the photo album in question. The defendants appealed, arguing that the district court erred as a matter of fact and law. Id. at 1134-35. The Eleventh Circuit reversed. The court noted that the second Walmart employee had scrolled through the entirety of the relevant photo album on the cell phone, at least three times in thumbnail format. Further, the Walmart employee's testimony "demonstrated that [the employee] was able to discern the images of the photos in the album by reviewing them in thumbnail format." Id. at 1135. The evidence also demonstrated that the employee had specifically opened and viewed only one of the two videos. Id. The Eleventh Circuit concluded, however, that the detective exceeded the scope of the private search by opening and viewing the second video which no Walmart employee viewed. In so doing, the court held that by viewing the second video, "[the detective's] review exceeded—not replicated—the breadth of the private search." Id. at 1336. In reaching this conclusion, the Eleventh Circuit noted that its ruling was "consistent with the reasoning in Riley v. California …." Id.

In the absence of any Eighth Circuit precedent to the contrary,[14] the undersigned is

---

[14] The circuits would appear to be split on the issue of the proper unit of measurement

persuaded that <u>Sparks</u> provides an appropriate analytical framework for applying the private

search doctrine to the digital images and videos stored on Suellentrop's cell phone. The

undersigned will apply a narrow unit of analysis—on the existing record in this case, the private

search extends only to those images and the video that Donnelly actually viewed, not the entire

photograph folder and not the entire cell phone.

In making this determination, the undersigned notes that <u>Sparks</u> references two

circumstances not supported by the record developed in this case. First, the evidence developed

in <u>Sparks</u> supported a conclusion that the Walmart employees scrolled through <u>all</u> of the

thumbnail images in the folder in question. Here, Donnelly testified that he did not look at all of

the thumbnail images. (Tr. 17) Second, in <u>Sparks</u>, the evidence supported a conclusion that the

employees recognized suspected child pornography in the thumbnail images. In this case,

Donnelly testified that, when the images were thumbnails, he could not "make them all out," and

that "the main images were kind of a little blurry at that size until [he] zoomed in on them." (<u>Id.</u>

at 17) Further, Donnelly testified that he enlarged only some of the thumbnail images and

viewed only one video. (<u>Id.</u>) Additionally, the undersigned notes that, in the context of a private

search, there is a meaningful difference between thumbnail images of photographs and

thumbnails of videos. A thumbnail of a video depicts only one image frame from a larger

collection of images, exactly what is contained within the larger collection of images is not

displayed. In contrast, a thumbnail image of a single photograph is essentially just smaller

---

when applying the private search doctrine to digital evidence. As noted above, the Eleventh
Circuit adopted a relatively narrow view in <u>Sparks</u>. In <u>United States v. Lichtenberger</u>, 786 F.3d
478, 488 (6th Cir. 2015), the Sixth Circuit also adopted a narrow view. In contrast, the Fifth and
Seventh Circuits have applied what appears to be a broader view of the private search doctrine.
<u>See</u> <u>United States v. Runyan</u>, 275 F.3d 449 (5th Cir. 2001) and <u>Rann v. Atchison</u>, 689 F.3d 832
(7th Cir. 2012). <u>Runyan</u> and <u>Rann</u> were decided before the Supreme Court decided <u>Riley</u>, while
<u>Sparks</u> and <u>Lichtenberger</u> were decided after <u>Riley</u>.

version of the photograph.[15]

Based on the record in this matter, the undersigned does not agree that the private search doctrine extends to all of the thumbnail images in the photo album/directory on Suellentrop's cell phone. Although the government established that Donnelly scrolled through many thumbnail images and looked at several larger images, it only proved with specificity that Donnelly looked at the image depicted in Government's Exhibit 5, the video depicted in Government's Exhibit 6, and the images that had penises superimposed on them which were not exhibited. On this record, the private search exception covers those images but no more. See Starr, 533 F.3d at 995 (explaining that the government intrusion may go "no further than the private search").

**B.      State-Issued Search Warrant**

The government does not rely entirely on the private search doctrine in this case. It argues that State and federal search warrants also authorized law enforcement to examine the cell phone.

Suellentrop argues that any evidence obtained as a result of the State-issued search warrant must be suppressed.[16] Suellentrop's position is simple—the State-issued warrant does not cover the cell phone because the warrant fails to mention the cell phone and Suellentrop's phone had already been seized by the time the Det. Poe applied for a warrant. The government

---

[15] See Orin Kerr, footnote 13 supra.

[16] The images and video viewed by Donnelly and presented to the Jefferson County Sheriff's Department involved at least one image of the victim infant with ejaculate on her face and a video of Suellentrop touching the victim infant's anus and vagina and French kissing the infant. When interviewed on January 1 and 3, 2017, Suellentrop admitted to making those images and the video, but suggested they were the result of recent acts which he committed in retaliation against his girlfriend for cheating on him. Suellentrop insisted that he had not penetrated the infant. The subsequent forensic examinations of Suellentrop's cell phone purportedly uncovered numerous videos of Suellentrop sexually abusing the victim infant which, according to date stamps, occurred months earlier than the images Donnelly reported on January 1, 2017. (ECF No. 25-1 at 43-48)

Appellate Case: 19-1002   Page: 36   Date Filed: 04/01/2019 Entry ID: 4772749

argues that the subsequent examination of Suellentrop's cell phone was conducted in reasonable reliance on the warrant. Thus, any evidence obtained need not be suppressed pursuant to the good-faith exception to the exclusionary rule.

Suellentrop is correct—the State search warrant and Det. Poe's affidavit do not expressly mention searching Suellentrop's cell phone. Suellentrop is also correct in noting that the warrant was issued after the phone had been seized by police. The phone itself was removed from the residence by Donnelly before the police arrived. Thus, Suellentrop contends that any examination of his cell phone conducted after it was seized was conducted in violation of the Fourth Amendment.

When police obtain evidence in violation of the Fourth Amendment, that evidence is ordinarily subject to suppression under the exclusionary rule. See Houck, 888 F.3d at 959 (citation omitted). The Supreme Court and the Eighth Circuit have cautioned, however, that suppression does not follow automatically from a Fourth Amendment violation. See id. at 959-60. "Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." Herring v. United States, 555 U.S. 135, 137 (2009); see also Houck, 888 F.3d at 959-60 (quoting same). For example, "[the] exclusionary rule does not apply 'when an officer acting with objective good-faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" United States v. Jackson, 784 F.3d 1227, 1231 (8th Cir. 2015) (quoting United States v. Leon, 468 U.S. 897, 921 (1984)). See also United States v. Farlee, 757 F.3d 810, 819 (8th Cir.) ("[W]hen assessing the officer's good faith reliance on a search warrant under the Leon good faith exception, we can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit."), cert. denied, 135 S. Ct. 504 (2014) (citations omitted).

For purposes of deciding Suellentrop's motion to suppress, the undersigned assumes that the State search warrant was defective because it did not expressly refer to the cell phone and the phone had already been removed from the residence. See Houck, 888 F.3d at 960; cf. United States v. Warford, 439 F.3d 836, (8th Cir. 2006) (considering "the applicability of the good-faith exception to the exclusionary rule" before considering probable cause because, "[i]f the officers acted in good-faith reliance on a warrant, then there is no need to visit the underlying question of probable cause") (citation omitted). The issue becomes whether law enforcement could reasonably rely on the warrant despite this defect.

The facts and circumstances of Houck are analogous and instructive to Suellentrop's case. In Houck, a detective determined that a computer IP address at Houck's mother's home was sharing child pornography on a peer-to-peer network. Another detective applied for and obtained a search warrant for the property. Prior to applying for the warrant, the detective conducted surveillance and observed a trailer-style RV in the driveway. "The warrant application included a request to search 'any vehicles ... present at the time of execution ....'" 888 F.3d at 958. The detective "testified that he did not specifically identify the RV in the warrant application or seek a separate warrant to search the RV based on his belief that it fell within the scope of the warrant's authorization to search 'any vehicles.'" Id. Law enforcement officers executed the search. At that time, the RV was not connected to any vehicle, but was connected to water and electric lines. Ultimately, officers seized a laptop, an iPhone, and an XD picture card from the RV. A forensic preview of the devices indicated that they contained child pornography. Id.

Houck was charged federally and moved to suppress the evidence seized from his RV and any other evidence as fruit of the poisonous tree. The district court granted the motion and

the Eighth Circuit reversed that decision. Id. at 959, 962. For purposes of review, the Eighth

Circuit assumed that Houck's RV fell outside the scope of the warrant, but "conclude[d] that the

officers made, at most an 'honest mistake' in interpreting warrant to include the RV." Id. at 960

(citing Maryland v. Garrison, 480 U.S. 79, 87 (1987)). The Court explained that, in Garrison, the

Supreme Court focused on an officer's reasonableness when searching a property that was not

within the scope of an otherwise valid warrant, noting that "we assess the reasonableness of

officers' actions 'in light of the information available to them at the time they acted,' ... and it

emphasized 'the need to allow some latitude for honest mistakes that are made by officers in the

dangerous and difficult process of ... executing warrants.'" Houck, 888 F.3d at 960-61 (quoting

Garrison, 480 U.S. at 85, 87).

Similarly, when considering the good-faith exception to the exclusionary rule, "[t]he

court must look at the objectively ascertainable question of whether a reasonably well trained

officer would have known that the search was illegal despite a judge's issuance of the warrant."

Jackson, 784 F.3d at 1231 (citations omitted).[17] "In assessing the objective reasonableness of a

police officer's execution of a warrant, [reviewing courts] must look to the totality of the

circumstances, including any information known to the officer but not presented to the issuing

---

[17] This good-faith exception to the exclusionary rule does not apply in the following
situations:
> (1) when the affidavit or testimony supporting the warrant contained a false
> statement made knowingly and intentionally or with reckless disregard for its
> truth, thus misleading the issuing judge;
> (2) when the issuing judge "wholly abandoned [the] judicial role" in issuing
> the warrant;
> (3) when the affidavit in support of the warrant is "so lacking in indicia of
> probable cause as to render official belief in its existence entirely
> unreasonable;" and
> (4) when the warrant is "so facially deficient" that no police officer could
> reasonably presume the warrant to be valid.

Jackson, 784 F.3d at 1231 (quoting Leon, 468 U.S. at 923).

Appellate Case: 19-1002   Page: 39   Date Filed: 04/01/2019 Entry ID: 4772749

judge." Id.

Applying these principles of good-faith and reasonableness to the facts of this case, the undersigned finds that Det. Poe and the Jefferson County Sheriff's Office are entitled to "some latitude for [an] honest mistake[]." Garrison, 480 U.S. at 87; see also Houck, 888 F.3d at 961 (quoting same).

There is no contention that Det. Poe's affidavit is false or that Det. Poe intentionally or with reckless disregard for the truth failed to specifically include the cell phone within the scope of the warrant. Likewise, there is no reason to suspect that the issuing judge abandoned his judicial role. Det. Poe's affidavit established more than sufficient probable cause to justify a search of Suellentrop's residence as well as his cell phone. Thus, the key issue is whether the State search warrant was so facially deficient that no reasonable officer could presume its validity, which in this case includes a question of whether Det. Poe could reasonably conclude that Suellentrop's cell phone fell within the scope of the warrant.

Det. Poe testified that he believed the search warrant covered the cell phone. The undersigned credits Det. Poe's testimony in this regard and for several reasons finds that Det. Poe's belief was reasonable given the circumstances. First, it was Det. Poe's intention that the warrant would cover the cell phone, and he testified that he consulted with a Jefferson County prosecutor regarding the scope of the warrant. In fact, Det. Poe's own actions corroborate his testimony that he believed the warrant covered the cell phone. Before requesting a warrant, Det. Poe asked Suellentrop for consent to search the home and phone, and Det. Poe included the cell phone on the inventory of items seized when he completed the warrant return form.

Second, the warrant was obtained in unusual circumstances. The phone had been in Suellentrop's residence earlier on January 1, 2017, but was taken from the residence by a third

26

party and turned over to the police. These events, including the warrant application and execution, occurred on a holiday and involved exchanging phone calls and digital communications. The conduct under investigation, however, involved credible allegations of serious child abuse and sexual exploitation which required prompt attention.

Third, although the warrant itself did not expressly refer to a specific cell phone, the affidavit made clear that Suellentrop's cell phone was at the heart of this investigation, and it established more than sufficient probable cause to search for electronic/digital evidence of child pornography at Suellentrop's residence and on his cell phone. Det. Poe's affidavit specifically referred to evidence of child pornography being stored on mass storage devices, and the warrant itself commanded law enforcement personnel "to search the computers, cameras, storage devices, and electronic devices seized by you, including any files that are password-protected or encrypted ...." (Gov't Exh. 11) Det. Poe testified that he intended for that language in his affidavit to cover a cell phone. (See, e.g., Tr. at 99)

While one might reasonably conclude that it would have been just as easy to include the words "cell phone" in the warrant, no less authority than the United States Supreme Court has recently explained that "[t]he term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." Riley, 134 S. Ct. at 2489 (also noting the "immense storage capacity" of modern cell phones). Accordingly, based on the totality of the circumstances, the undersigned finds that a reasonable officer could conclude that the State-issued warrant was valid and included within its scope Suellentrop's cell phone.

In summary, Det. Poe and those examining Suellentrop's cell phone on the basis of the

27

State-issued search warrant "did not violate [Suellentrop's] Fourth Amendment rights deliberately, recklessly, or with gross negligence." United States v. Davis, 564 U.S. 229, 240 (2011). "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" Id. at 238; see also United States v. Tuton, 893 F.3d 562, 569-70 (8th Cir. 2018) (quoting same). The purposes of the exclusionary rule would be poorly served in the circumstances of this case.

For the reasons outlined above, the undersigned finds that Det. Poe's reliance on the authority of the State search warrant was objectively reasonable and recommends that Suellentrop's motion to suppress evidence from his cell phone be denied.

## C.   Federal Search Warrant for Suellentrop's Cell Phone

In the alternative, assuming that the evidence obtained as a result of the State-issued warrant is subject to suppression, the Court will address Suellentrop's contention that any evidence obtained pursuant to the federal search warrant must also be suppressed. In this regard, Suellentrop argues that the affidavit S/A Burbridge submitted with his application for the federal warrant intentionally or recklessly omitted material information and included false information that, if corrected, would deprive the affidavit of probable cause. As such, Suellentrop requested a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).

The government contends there was no need for a Franks hearing, and even if the prior State-issued search warrant was defective, this Court need not suppress any evidence as fruit of the poisonous tree because the evidence obtained pursuant to the federal warrant is otherwise admissible under the independent source and inevitable discovery doctrines.

### 1.    *Franks – Omitted and False Information*

"The Fourth Amendment requires a showing of probable cause before a search warrant

may be issued." United States v. Williams, 477 F.3d 554, 557 (8th Cir. 2007).  Normally,

"[w]hen a magistrate relies solely on an affidavit to issue the warrant, only that information

which is found within the four corners of the affidavit may be considered in determining the

existence of probable cause." United States v. Farlee, 757 F.3d 810, 819 (8th Cir.) (internal

quotations and citation omitted), cert. denied, 135 S. Ct. 504 (2014).  In Franks, the Supreme

Court explained that, in certain circumstances, the Fourth Amendment entitles a defendant to an

evidentiary hearing regarding the accuracy of a search warrant affidavit. See Franks, 438 U.S. at

155-56.

A defendant is not automatically entitled to an evidentiary hearing under Franks.  "There

is ... a presumption of validity with respect to the affidavit supporting [a] search warrant."

Franks, 438 U.S. at 171.  A defendant's conclusory allegations of false or omitted information

are insufficient. Id.  "In order to be entitled to a hearing under Franks the defendant must make a

substantial preliminary showing of a false or reckless statement or omission and must also show

that the alleged false statement or omission was necessary to the probable cause determination."

United States v. Crissler, 539 F.3d 831, 833 (8th Cir. 2008) (internal citations and quotations

omitted). See also United States v. Gater, 868 F.3d 657, 659-60 (8th Cir.), cert. denied, 138 S.

Ct. 751 (2017); United States v. Mashek, 606 F.3d 922, 928 (8th Cir.  2010).  A defendant's

substantial "showing is not easily made." United States v. Engler, 521 F.3d 965, 969 (8th Cir.

2008).  "Allegations of negligence or innocent mistake will not suffice to demonstrate a reckless

or deliberate falsehood." Mashek, 606 F.3d at 928 (citing Franks, 438 U.S. at 171).

Where a defendant argues that the affidavit omitted material facts

Appellate Case: 19-1002   Page: 43   Date Filed: 04/01/2019   Entry ID: 4772749

the Fourth Amendment requires a hearing where the defendant makes a substantial preliminary showing that (1) the affiant omitted facts with the intent to mislead the issuing judge, or omitted the facts in reckless disregard of the fact that the omissions would mislead, and (2) the affidavit, if supplemented by the omitted information could not support a finding of probable cause.

Gater, 868 F.3d at 659-60 (citing United States v. Conant, 799 F.3d 1195, 1200 (8th Cir. 2015)).

A similar analysis applies to the inclusion of false facts in an affidavit. See, e.g., United States v. Clapp, 46 F.3d 795, 799 (8th Cir. 1995). To determine whether statements were made with reckless disregard for the truth, courts consider "whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." United States v. Butler, 594 F.3d 955, 961 (8th Cir. 2010). See also Gater, 868 F.3d at 659-60 (omitted facts); United States v. Clapp, 46 F.3d 795, 799 (8th Cir. 1995).

It is not disputed herein that S/A Burbridge's affidavit omitted facts relative to the prior warrant. The affidavit does not mention that Det. Poe relied on the State-issued search warrant to authorize an examination of the cell phone, it does not mention the additional evidence of child pornography located as a result of the State examinations, and it does not mention any concerns S/A Burbridge had regarding the scope of the State warrant. Further, one can argue that two paragraphs included representations that, without additional context, can be characterized as false. In relevant part, paragraph 24 of the affidavit states as follows: "Deputy Roberts seized the cellular telephone and no additional examination was done...." (Gov't Exh. 14) Paragraphs 27-28 note that a State search warrant had been issued, but paragraph 29 represents that "[t]he search did not yield any additional items of evidentiary value relating to sodomy or child pornography." (Id.) In fact, there was an additional examination of the cell phone which uncovered additional images of evidentiary value.

30

The gist of the government's position is that S/A Burbridge's affidavit omitted information regarding the prior search warrant so that any information gleaned from the prior warrant and subsequent examination would not taint this Court's probable cause decision.[18] As for the allegations in paragraphs 24 and 29, the government notes that the facts included in S/A Burbridge's affidavit were intended to convey a timeline of events on January 1, 2017, and not intended to mislead the Court as to the fact that Jefferson County authorities had, in fact, examined Suellentrop's cell phone. Viewed in the context advanced by the government, the affidavit is arguably accurate.

At the evidentiary hearing, the undersigned concluded that Suellentrop had not met his burden pursuant to <u>Franks</u>. The omitted and allegedly false information involve facts that the State had already examined the phone and located additional evidence of child exploitation and child pornography beyond that which Donnelly discovered and showed to Dep. Roberts on January 1, 2017. Based on the record in this matter, the undersigned finds that S/A Burbridge did not present his affidavit with any intention of misleading the Court. With respect to the allegedly false information, the affidavit is accurate to the extent that it recounts the events of January 1, 2017. For example, Dep. Roberts observed one image of child pornography when Donnelly showed him the cell phone, then he seized the phone and put it away without further examination. A similar reading applies to paragraphs 28 and 29, which describe the search of Suellentrop's residence on January 1, 2017. The search of the residence did not yield any

---

[18] The Sixth Circuit has seemingly approved a similar approach. In <u>United States v. Bah</u>, 794 F.3d 617 (6th Cir. 2015), officers conducted a warrantless search of a defendant's cell phone incident to an arrest. Thereafter, an officer applied for a search warrant but omitted the tainted information from the affidavit. The Sixth Circuit noted, "[b]y omitting the tainted evidence from the warrant affidavit, [the affiant] voluntarily removed—ex ante—the 'illegally determined facts' and permitted the magistrate judge to make an untainted probable cause determination." <u>Id.</u> at 633-34. S/A Burbridge followed a similar approach when he applied for a warrant to search Suellentrop's cell phone.

Appellate Case: 19-1002   Page: 45   Date Filed: 04/01/2019 Entry ID: 4772749

additional evidence regarding sodomy or child exploitation.

Suellentrop contends that S/A Burbridge's affidavit was incomplete and omitted information regarding the prior State-issued search warrant. In essence, Suellentrop's position is that the State warrant did not cover the cell phone and that, if S/A Burbridge's affidavit included all of the facts regarding the State warrant and prior examinations of the cell phone, this Court would not have issued a federal search warrant. The problem with Suellentrop's argument is that it conflates the issue of probable cause with the ultimate question of suppression under the fruit of the poisonous tree doctrine. In issuing a search warrant, which is usually conducted in an ex parte proceeding, a court must decide only whether the affidavit supports a finding of probable cause and describes with particularity both the property to be searched and things to be seized. See U.S. Const. amend. IV; Dalia v. United States, 441 U.S. 238, 255 (1979); Fed. R. Crim. P. 41(d)(1) ("After receiving an affidavit or other information, a magistrate judge … must issue the warrant if there is probable cause to search for and seize a person or property …."). Application of the exclusionary rule is normally going to be an issue best addressed with the benefit of a full adversarial process. Courts are not well-equipped decide ex parte and ex ante whether the evidence likely to be seized as a result of a requested search warrant would later be subject to suppression as fruit of the poisonous tree.[19] One need look no further than the facts of this case to draw such a conclusion—a determination regarding the admissibility of the cell phone evidence obtained pursuant to the State-issued warrant involved an evidentiary hearing and consideration of complicated, fact-bound issues such as good faith and the circumstances

---

[19] Cf. United States v. Grubbs, 547 U.S. 90, 99 (2006) ("The Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, ex ante, the 'deliberate, impartial judgment of a judicial officer … between the citizen and the police,' … and by providing ex post, a right to suppress evidence improperly obtained ….") (quoting Wong Sun v. United States, 371 U.S. 471, 481-82 (1963)).

32

surrounding the issuance of the warrant.

Even accepting the factual premise of Suellentrop's position—that S/A Burbridge intended to mislead the Court by omitting information regarding the prior State search and examination—including the material omitted information and deleting or correcting the false information would bolster probable cause.[20] In this regard, one cannot credibly argue that law enforcement lacked probable cause to search Suellentrop's cell phone. The information from Donnelly, combined with the image Donnelly showed to Dep. Roberts, combined with Suellentrop's statements on January 1, 2017, provided overwhelming probable cause to justify a warrant to search the cell phone. Adding the omitted facts and correcting or deleting the allegedly false statements would not eliminate probable cause.

Suellentrop failed to show he was entitled to a Franks hearing.

### 2.   *Independent Source Doctrine*

The Court next considers whether the evidence obtained pursuant to the federal warrant should be suppressed as fruit of the poisonous tree. "Under the [Supreme] Court's precedents, the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and, … 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)) (internal quotations omitted). The government argues that, even if the prior State-issued warrant did not cover Suellentrop's

---

[20] The following facts would supplement and correct the affidavit for purposes of evaluating Suellentrop's Franks argument: (1) that Jefferson County authorities examined the cell phone after it was seized on January 1, 2017; (2) that the January 1, 2017, State-issued warrant did not expressly identify the cell phone as a subject of warrant; and (3) that the examination yielded additional evidence of child pornography. Whether S/A Burbridge personally questioned the scope of the State warrant is not a fact relevant to probable cause in this case, but including such a fact in the affidavit would not eliminate probable cause.

33

cell phone, the results of the federal examination of the cell phone are admissible pursuant to the independent source doctrine.

"[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." Strieff, 136 S. Ct. at 2061 (citing Murray v. United States, 487 U.S. 533, 537 (1988)); see also United States v. Brooks, 715 F.3d 1069, 1075 (8th Cir. 2013) ("Under the independent source doctrine, the exclusionary rule is inapplicable where the evidence was acquired through a source independent of the tainted search."). A search warrant may serve as an independent source. See United States v. Rodriguez, 834 F.3d 937, 942 (8th Cir. 2016); United States v. Swope, 542 F.3d 609, 613 (8th Cir. 2008). To determine whether a warrant serves as an independent source, "this court asks 'first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them.'" Rodriguez, 834 F.3d 937, 942 (8th Cir. 2016) (quoting Swope, 542 F.3d at 613). In this regard, a reviewing court "[g]enerally ... may not 'infer from the circumstances that the police inevitably would have sought a warrant; findings of fact by the district court are required.'" Id. (quoting United States v. Leveringston, 397 F.3d 1112, 1115 (8th Cir. 2005)).

The record established at the evidentiary hearing supports a conclusion that the FBI would have applied for a search warrant even if there were no concerns regarding the State-issued warrant. S/A Burbridge testified that, after he received reports from the Jefferson County Sheriff's Department, he determined that he would apply for a federal warrant. When asked why, S/A Burbridge first testified that he wanted to make sure he had "all of the evidence that was inside the phone, you know, extract it.... I wanted all the information that could be obtained

34

within the phone." (Tr. 125)  As for concerns for the State-issued warrant, S/A Burbridge testified that he did not know for sure whether the phone was covered by that warrant.  (See id.) S/A Burbridge has more than 30 years of experience as a federal agent.  The undersigned had the opportunity to observe S/A Burbridge's demeanor during his direct and cross examination and fully credits his testimony in this matter.

Based on this record, the undersigned finds by a preponderance of the evidence that, once a federal investigation was underway, S/A Burbridge would have applied for a federal warrant, regardless of whether he also harbored concerns as to the scope of the prior State-issued search warrant.  S/A Burbridge testified he wanted to ensure that all of the evidence on the cell phone was extracted.  Thus, the Court need not simply "infer from the circumstances," see Rodriguez, 834 F.3d at 942, that the FBI would inevitably have done once the case was referred to them. Accordingly, the government has met its burden under the first prong of the requisite inquiry under the independent source doctrine.

The government readily satisfies the second prong of the independent source doctrine because the search warrant affidavit S/A Burbridge submitted did not refer to any tainted information.  The affidavit supplies ample probable cause to conclude that evidence of child pornography was located on Suellentrop's cell phone.

In summary, even assuming that the additional cell phone evidence obtained pursuant to the State-issued search warrant must be suppressed, the federal search warrant serves as an independent source.  Therefore, the evidence obtained as a result of the federal search warrant should not be suppressed as fruit of the poisonous tree.

35

**D.    Alleged Violations of Missouri Law**

In his post-hearing memorandum, Suellentrop briefly refers to alleged violations of his rights under the Missouri Constitution and statutes. To the extent Suellentrop relies on Missouri law to support his motion to suppress, his reliance is contrary to Eighth Circuit precedent. In general, evidence is not suppressed for violations of state law absent a violation of the Fourth Amendment, even if the search is executed by state officers. See United States v. Faulkner, 826 F.3d 1139, 1146 (8th Cir. 2016) (citation omitted), cert. denied, 137 S. Ct. 2092 (2017); see also United States v. Hornbeck, 118 F.3d 615, 617 (8th Cir. 1997).

**II.    Motion to Suppress Statements**

Shortly before the evidentiary hearing in this matter, Suellentrop filed a general motion to suppress statements (ECF No. 33), broadly arguing that any statements he made were not voluntary, were made in violation of his Miranda rights, and were the product of an unlawful arrest. Suellentrop does not address these issues in his post-hearing memoranda. For completeness, the undersigned will briefly address Suellentrop's statements.

Suellentrop made statements twice in this matter. He first made statements on January 1, 2017, after being detained and while seated Dep. Lunsford's official car. Suellentrop also made statements to Det. Poe on January 3, 2017, while in custody.

Generally, statements made to law enforcement officers during custodial interrogation are subject to the protections and procedures identified in Miranda v. Arizona, 384 U.S. 436, 477-78 (1966). See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). If, after being given Miranda warnings, a defendant agrees to make a statement, the government must show that the waiver was voluntary, knowing, and intelligent for the statement to be admissible.

Appellate Case: 19-1002   Page: 50   Date Filed: 04/01/2019 Entry ID: 4772749

Colorado v. Connelly, 479 U.S. 157, 169-70, 174 (1986); North Carolina v. Butler, 441 U.S. 369, 373-76 (1979); Miranda, 384 U.S. at 444, 475. The government has the burden of proving by a preponderance of the evidence that a suspect voluntarily and knowingly waived his Miranda rights, and that the resulting statements were voluntary. See Connelly, 479 U.S. at 168 (1986); LeBrun, 363 F.3d at 724. The government has met its burden in this case.

First, based on the information from Donnelly and the image viewed by Dep. Roberts, there was probable cause to arrest Suellentrop on January 1, 2017. Therefore, there is no credible contention that Suellentrop's arrest was unlawful. Second, based on the record herein, which included copies of written forms as well as a recording of Suellentrop's statements (Gov't Exhs. 8, 9, 9A, and 10), the undersigned finds that Suellentrop was given appropriate Miranda warnings, understood his rights, voluntarily waived those rights, never requested counsel, and never invoked his right to remain silent. The record also demonstrates that Suellentrop retained a significant degree of free agency—he refused a request to sign a consent-to-search form and provided cogent reasons for his refusal. Further, Suellentrop was not threatened, coerced, tricked, or mistreated in any way. His statements to Jefferson County Sheriff's deputies on January 1, 2017, were voluntary under the law.

The record before the Court also supports a conclusion that Suellentrop's statements to Det. Poe on January 3, 2017, should not be suppressed. Det. Poe's interview was video and audio recorded. Det. Poe confirmed that Suellentrop had previously waived his Miranda rights, and Suellentrop has not argued herein that he was entitled to fresh warnings or that his prior waiver of rights was no longer applicable. At no time did Suellentrop request a lawyer or express a desire to remain silent. The recording demonstrates that Suellentrop answered Det.

Appellate Case: 19-1002   Page: 51   Date Filed: 04/01/2019 Entry ID: 4772749

Poe's questions voluntarily and that he was not threatened, coerced, mistreated, or deceived.[21]

The undersigned recommends that Suellentrop's motion to suppress statements be denied.

### CONCLUSION

For the reasons set forth above, the undersigned respectfully recommends that this Court deny Defendant's Motion to Suppress Physical Evidence. The undersigned finds that the private search exception applies to the specific images and video that Donnelly identified during the evidentiary hearing, which include Gov't Exhs. 5 and 6 and the images Donnelly viewed that appeared to include superimposed images of penises. Based on the existing record, however, the private search exception does not extend to all of the images and videos on Suellentrop's cell phone. The undersigned further finds that Det. Poe's reliance on the State-issued warrant was reasonable under the circumstances. Therefore, the good-faith exception to the exclusionary rule applies to the cell phone evidence obtained pursuant to that warrant. Finally, even if the State-issued warrant did not encompass the cell phone evidence, the federal search warrant serves as an independent source of the cell phone evidence in this matter.

The undersigned also respectfully recommends that the Court deny Suellentrop's Motion to Suppress Statements. Although Suellentrop was questioned twice while in custody, he was given written Miranda warnings, voluntarily waived his rights, and voluntarily answered questions posed to him.

---

[21] Near the beginning of the interview, Suellentrop expressed concern that he might be harmed due to the nature of his alleged crime. Det. Poe made it clear that he had no desire to harm Suellentrop. At no point in the video did Suellentrop indicate or suggest that he had, in fact, been mistreated in any way.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Physical Evidence [ECF No. 25] be **DENIED.**

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Statements [ECF No. 33] be **DENIED.**

The parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Memorandum, Recommendations, and Order, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); see also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

The trial of this matter has been set for Monday, September 17, 2018, at 8:30 a.m., before the Honorable Catherine D. Perry, United States District Judge.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  23rd   day of  July , 2018.

Appellate Case: 19-1002   Page: 53   Date Filed: 04/01/2019 Entry ID: 4772749

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:17 CR 435 CDP |
| | ) | |
| DENNIS M. SULLENTROP, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on defendant Dennis M. Sullentrop, Jr.'s

motions to suppress physical evidence and statements.   Pursuant to 28 U.S.C. §

636(b), the motions were referred to United States Magistrate John M.

Bodenhausen, who held a hearing and then recommended that the motions be

denied.   Defendant filed timely objections.   I have conducted *de novo* review of

the motions to suppress, including reviewing the motions and the law and the

transcript of the hearing before Judge Bodenhausen.   I have also reviewed

exhibits 7 through 15 that were presented at the hearing.[1]   I conclude that the

motions to suppress should be denied.   Over the objections of the defendant, I

will adopt the Report and Recommendation of Judge Bodenhausen.

---

[1] I have not reviewed exhibits 1 through 6, as they are not necessary for a determination of the
issues on the motions to suppress.

### Background[2]

Defendant Dennis M. Sullentrop, Jr. was arrested on January 1, 2017, after police were summoned to his home because another person had discovered suspected child pornography on defendant's cell phone.   When police arrived the other person provided them with the cell phone and showed them some images. After viewing the images shown to them, police retained the phone as evidence and did not examine it further at that time.   The person providing the phone told police that he had been given permission by defendant to use the phone and that defendant had previously provided him with the password.   Defendant, who was sleeping inside, was awakened and arrested.   After being given *Miranda* warnings he made certain statements.   He made additional statements while in custody two days later.

The police obtained a state search warrant for defendant's home.   Although the affidavit in support of the warrant application discussed the cell phone and evidence already seen on it, the warrant itself did not specifically list the cell phone as an item to be searched.   The warrant did authorize a search for other electronic devices ("DVDs, DCs, video cassettes, mass storage devices (i.e. hard

---

[2] This is a summary of the facts based on the testimony at the suppression hearing; I am not repeating all the factual findings and legal conclusions of the Magistrate Judge, as I conclude that they are all correct.

drive, computers, jump drives, etc.")).   After obtaining the warrant the police searched the house and seized certain drug-related evidence, but found no further evidence of child pornography.   They also searched the cell phone and discovered additional images of child pornography.

At some point the county police contacted federal authorities.   An FBI agent prepared an affidavit in support of a federal search warrant and a federal warrant was issued authorizing a search of the cell phone.   The affidavit accurately described how the police obtained the telephone and that they had seen images of child pornography on it when it was provided by the third person.   The affidavit stated that on the day of the arrest the police officer "seized the cellular telephone and no additional examination was done."   It also described the state warrant to search the home and stated:   "The search [of the home] did not yield any additional items of evidentiary value relating to sodomy or child pornography."   The federal application did not inform the issuing Magistrate Judge that the cell phone had been searched later and that additional items of child pornography had been found.   After obtaining the federal warrant, law enforcement conducted a forensic search of the cell phone and found additional items of child pornography.

- 3 -

## Discussion

After conducting the evidentiary hearing, Judge Bodenhausen filed a 39 page Report and Recommendation.   My *de novo* review shows that his description of the facts is fully supported by the evidence that was presented.   I also credit the testimony of the witness over that of the defendant regarding whether the witness has permission to be in the home and to use the cell phone, and regarding how the witness knew the phone's password.   Additionally, Judge Bodenhausen's conclusions of law are entirely correct.

The officers' initial warrantless seizure and viewing of the cell phone on January 1, 2017 is justified by the private search exception to the warrant requirement.   Specifically, the person who provided the phone to the police and showed them the initial images of child pornography had possession of it, indicated that defendant had authorized his use of it and had provided the password, and was not acting on behalf of law enforcement when he viewed the images.   Thus, the images the person showed the police should not be suppressed.

The examination of the other images and videos later found on Sullentrop's cell phone were obtained in good-faith reliance on a valid state search warrant. Although the warrant application did not specifically include the cell phone as an item to be searched, the officer who prepared the affidavit fully intended it to

- 4 -

cover the phone, and believed that it did cover that phone.   Because the search was done in good-faith reliance on a valid search warrant, this evidence should not be suppressed.

Moreover, the federal search warrant provided an independent source of this additional cell phone evidence.   That warrant application did not mention that officials had already found additional child pornography on the telephone, but instead relied only on the initial images that were shown to the arresting officers by the witness.   Although defendant argues that this was a false statement warranting a further hearing, he is not correct.   The things that were omitted from the federal affidavit would have bolstered the probable cause for the federal warrant; they would not have detracted from it.   This was a correct procedure to assure that the issuing Magistrate Judge evaluated the evidence without considering evidence obtained by a potentially invalid state search of the phone.

Finally, the evidence shows that both of Sullentrop's statements were made voluntarily after he had been given oral and written *Miranda* warnings, and there is no basis for suppressing those statements.

Accordingly,

**IT IS HEREBY ORDERED** that the Report and Recommendation of the United States Magistrate Judge [50] is **SUSTAINED, ADOPTED, and**

Appellate Case: 19-1002   Page: 58   Date Filed: 04/01/2019   Entry ID: 4772749

**INCORPORATED** herein, and defendant Dennis M. Sullentrop's Motions to

Suppress Physical Evidence and Statements [25, 33] are **GRANTED**.

**IT IS FURTHER ORDERED** that this case has been set for trial on the

two-week docket beginning **Monday, September 17, 2018 at 8:30 a.m. in**

**Courtroom 14 South.**

**IT IS FURTHER ORDERED** that a final pretrial hearing and hearing to

make a record of any plea offers or concessions offered by the United States will

be held on **Tuesday, August 28, 2018 at 2:30 p.m. in Courtroom 14 South.**

Catherine D. Perry

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 13th day of August, 2018.

- 6 -

# United States District Court

### Eastern District of Missouri

UNITED STATES OF AMERICA

v

DENNIS M. SUELLENTROP, JR.

### JUDGMENT IN A CRIMINAL CASE

CASE NUMBER:  4:17CR00435 CDP

USM Number:  47036-044

Joseph M. Hogan
_____
Defendant's Attorney

**THE DEFENDANT:**

☒ pleaded guilty to count(s)   One - Eight on September 6, 2018.

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☐ was found guilty on count(s) _____
  after a plea of not guilty

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 2251(a) and 18 U.S.C. § 2251(e) | Production of Child Pornography | Between on or about August 19, 2016, and on or about August 20, 2016 | One |
| 18 U.S.C. § 2251(a) and 18 U.S.C. § 2251(e) | Production of Child Pornography | On or about August 21, 2016 | Two |
| 18 U.S.C. § 2251(a) and 18 U.S.C. § 2251(e) | Production of Child Pornography | On or about August 31, 2016 | Three |

The defendant is sentenced as provided in pages 2 through __8__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

December 20, 2018
_____
Date of Imposition of Judgment

_____
Signature of Judge

Catherine D. Perry
United States District Judge
_____
Name & Title of Judge

December 20, 2018
_____
Date signed

Record No.:  609

DEFENDANT: __DENNIS M. SUELLENTROP, JR.__

CASE NUMBER: __4:17CR00435 CDP__

District: __Eastern District of Missouri__

# ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2251(a) and 18 U.S.C. § 2251(e) | Production of Child Pornography | On or about September 8, 2016 | Four |
| 18 U.S.C. § 2251(a) and 18 U.S.C. § 2251(e) | Production of Child Pornography | On or about September 9, 2016 | Five |
| 18 U.S.C. § 2251(a) and 18 U.S.C. § 2251(e) | Production of Child Pornography | On or about September 17, 2016 | Six |
| 18 U.S.C. § 2251(a) and 18 U.S.C. § 2251(e) | Production of Child Pornography | Between on or about December 28, 2016, to on or about December 29, 2016 | Seven |
| 18 U.S.C. § 2252A(a)(5)(B) and 18 U.S.C. § 2252A(b)(2) | Possession of Child Pornography | Between on or about December 30, 2016, to on or about January 1, 2017 | Eight |

DEFENDANT:  DENNIS M. SUELLENTROP, JR.

CASE NUMBER:  4:17CR00435 CDP

District:  Eastern District of Missouri

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of __120 years.__

This term consists of a term of 30 years on each of Counts 1 through 4, all such terms to be served consecutively and terms of 30 years on Counts 5 through 7 and 20 years on Count 8, with the sentence on Counts 5-8 to be served concurrently with one another and with the sentence on Counts 1-4, for an aggregate sentence of 120 years.

This sentence shall run concurrent to any sentence imposed under Docket No. 17JR-CR00001-03, pursuant to USSG §5G1.3, as this charge is relevant conduct to the instant offense.

☒  The court makes the following recommendations to the Bureau of Prisons:

that the defendant be evaluated for participation in the Residential Drug Abuse Program, Sex Offender Management Program and mental health treatment. It is also recommended the defendant be evaluated for participation in an Occupational/Educational program. Such recommendations are made to the extent they are consistent with the Bureau of Prisons policies. It is also recommended that the defendant be placed at FCI - Marianna, Florida or USP - Marion, Illinois.

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at _____ a.m./pm on _____

☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 2 p.m. on _____

☐  as notified by the United States Marshal

☐  as notified by the Probation or Pretrial Services Office

## MARSHALS RETURN MADE ON SEPARATE PAGE

AO 245B (Rev. 09/ Case: 4:17-cr-00435-CDP Doc. #: ...Sheet Docs...views Rel 46   Filed: 12/20/18   Page: 4 of 10 PageID #: 623

Judgment-Page __4__ of __8__

DEFENDANT: DENNIS M. SUELLENTROP, JR.
CASE NUMBER: 4:17CR00435 CDP
District:   Eastern District of Missouri

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of   LIFE.

This term consists of a term of life on each of Counts 1 through 8, all such terms to run concurrently.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

   ☐ The above drug testing condition is suspended, based on the court's determination that you
   pose a low risk of future substance abuse. *(check if applicable)*

4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a
   sentence of restitution. *(check if applicable)*

5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6. ☒ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 20901,
   et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in
   the location where you reside, work, are a student, or were convicted of a qualifying offense. (check if applicable)

7. ☐ You must participate in an approved program for domestic violence. (check if applicable)

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/11 Judgment in a Criminal Case Sheet 3C — Supervised Release    Filed: 12/20/18   Page: 5 of 10 PageID #: 624

Case: 4:17-cr-00435-CDP   Doc. #: 76

Judgment—Page   5   of   8

DEFENDANT:   DENNIS M. SUELLENTROP, JR.
CASE NUMBER:   4:17CR00435 CDP
District:   Eastern District of Missouri

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____      Date _____

DEFENDANT:    DENNIS M. SUELLENTROP, JR.
CASE NUMBER:    4:17CR00435 CDP

District:    Eastern District of Missouri

## ADDITIONAL SUPERVISED RELEASE TERMS

While on supervision, the defendant shall comply with the standard conditions that have been adopted by this Court and shall comply with the following additional conditions. If it is determined there are costs associated with any services provided, the defendant shall pay those costs based on a co-payment fee established by the probation office.

1. You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

2. You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

3. You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

4. You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation.

5. You must not possess and/or use computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media without approval of the probation office.

6. You must advise the probation office of all computers, electronic equipment, and web enabled equipment, including cell phones, to which you possess or have access within 24 hours of obtaining same.

7. You must not access the Internet except for reasons approved in advance by the probation officer.

8. You must allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) you use.

9. To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent the monitoring software after its installation. You must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

10. You must not possess or use any audio/visual recording or producing equipment at any location without the written approval of the probation office. If approval is given, you must consent to the probation office or probation service representative conducting unannounced examinations, including retrieval and copying of all data related to the equipment.

11. You must not view or possess any "visual depiction" (as defined in 18 U.S.C. § 2256), including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of "sexually explicit conduct" (as defined in 18 U.S.C. § 2256).

12. You must not have direct contact with any child you know or reasonably should know to be under the age of 18, including your own children, without the permission of the probation officer. If you do have any direct contact with any child you know or reasonably should know to be under the age of 18, including your own children, without the permission of the probation officer, you must report this contact to the probation officer within 24 hours. Direct contact includes written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

13. You are prohibited from engaging in any occupation, business, profession, or volunteer work where you have access to children under the age of 18 without prior written approval from the probation office. You must not go to, or remain at, any place where you know children under the age of 18 are likely to be, including parks, schools, playgrounds, and childcare facilities. You must not go to, or remain at, a place for the primary purpose of observing or contacting children under the age of 18.

14. You must participate in a sex offense-specific treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

15. You must submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure that you are in compliance with the requirements of your supervision or treatment program.

16. You must not communicate, or otherwise interact, with M.S., either directly or through someone else, without first obtaining the permission of the probation officer.

17. You must pay the costs of any future counseling for the victim of the instant offense, should counseling be pursued.

Judgment—Page __7__ of __8__

DEFENDANT: DENNIS M. SUELLENTROP, JR.
CASE NUMBER: 4:17CR00435 CDP
District: Eastern District of Missouri

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on sheet 6

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| Totals: | $800.00 | | | |

☐ The determination of restitution is deferred until _____. *An Amended Judgment in a Criminal Case* (AO 245C) will be entered after such a determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant ot 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| Totals: | | | |

☐ Restitution amount ordered pursuant to plea agreement _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ The interest requirement is waived for the. ☐ fine ☐ restitution.

☐ The interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994 but before April 23, 1996.

Judgment-Page __7__ of __8__

DEFENDANT: DENNIS M. SUELLENTROP, JR.
CASE NUMBER: 4:17CR00435 CDP
District: Eastern District of Missouri

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on sheet 6

|  | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| Totals: | $800.00 | | | |

☐ The determination of restitution is deferred until _____ . *An Amended Judgment in a Criminal Case* (AO 245C)
will be entered after such a determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| Totals: | | | |

☐ Restitution amount ordered pursuant to plea agreement _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ The interest requirement is waived for the. ☐ fine ☐ restitution.

☐ The interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994 but before April 23, 1996.

Judgment-Page <u>8</u> of <u>8</u>

DEFENDANT: <u>DENNIS M. SUELLENTROP, JR.</u>
CASE NUMBER: <u>4:17CR00435 CDP</u>
District: <u>Eastern District of Missouri</u>

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ☒ Lump sum payment of <u>$800.00</u> due immediately, balance due

    ☐ not later than _____ , or

    ☒ in accordance with ☐ C, ☐ D, or ☐ E below; or ☒ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ E below; or ☐ F below; or

C ☐ Payment in equal _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of _____ e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐ Payment in equal _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of _____ e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after Release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒ Special instructions regarding the payment of criminal monetary penalties:

**IT IS FURTHER ORDERED** that the defendant shall pay to the United States a special assessment of $100 on each of Counts 1 through 8, for a total of $800, which shall be due immediately. As the defendant appears to be indigent, the additional special assessment of $5,000 is not recommended.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalty payments, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program are made to the clerk of the court.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ **Joint and Several**
Defendant and Co-defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ **The defendant shall forfeit the defendant's interest in the following property to the United States:**

Payments shall be applied in the following order: (1) assessment; (2) restitution principal, (3) restitution interest, (4) fine principal, (5)fine interest (6) community restitution.(7) penalties, and (8) costs, including cost of prosecution and court costs.

DEFENDANT:  DENNIS M. SUELLENTROP, JR.

CASE NUMBER:  4:17CR00435 CDP

USM Number:  47036-044

# UNITED STATES MARSHAL
## RETURN OF JUDGMENT IN A CRIMINAL CASE

I have executed this judgment as follows:

_____

_____

The Defendant was delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By  _____

Deputy U.S. Marshal

☐   The Defendant was released on _____ to_____ Probation

☐   The Defendant was released on _____ to_____ Supervised Release

☐   and a Fine of_____  ☐ and Restitution in the amount of_____

_____

UNITED STATES MARSHAL

By  _____

Deputy U.S. Marshal

I certify and Return that on _____, I took custody of _____

at _____ and delivered same to _____

on _____ F.F.T. _____

U.S. MARSHAL E/MO

By DUSM _____